**Estate of Francis John GRAHAM, Deceased**

**No. 13-00-334-CV.**

Court of Appeals of Texas, Corpus Christi.

Dec. 13, 2001.

Rehearing Overruled March 14, 2002.

John C. Holmgreen, Jr., Gary, Thomasson, Hall & Marks, Corpus Christi, for appellant.

M.W. Meredith, Jr., Meredith, Donnell & Abernethy, N.J. Welsh III, Thompson & Welch, Corpus Christi, for appellee.

Before Justices DORSEY, HINOJOSA, and CASTILLO.

## OPINION

DORSEY, Justice.

This is a will contest. Frances Graham died in 1998 at the age of 83 years. His wife predeceased him, and he had no children. Two years before his death, Mr. Graham executed a will leaving his entire estate to the two daughters of his full sister. After Mr. Graham's will was admitted to probate, his seven remaining nieces and nephews brought suit to challenge the will. Those nieces and nephews are the children of Mr. Graham's half-sister. The two nieces who are beneficiaries under the will are the "will proponents," and the seven nieces and nephews who brought this are the "will contestants."

In their suit, the will contestants asserted that the will was invalid for the following reasons:

(1) it was not executed with the formalities and solemnities required by the Texas Probate Code;

(2) Mr. Graham lacked testamentary capacity when he executed it;

(3) it was executed as a result of the undue influence and fraud;

(4) Mr. Graham did not intend the document to be a will; and,

(5) Mr. Graham was mistaken as to the contents of the instrument.[1]

The will proponents moved for summary judgment on all causes of action. Their motion contained language indicating that judgment was sought on both no-evidence and traditional summary judgment grounds. *Compare* TEX. R. CIV. P. 166a(c) (traditional) with TEX. R. CIV. P. 166a(i) (no-evidence). The trial court granted the motion on unspecified grounds, and entered an order that the will contestants take nothing by their suit. We have determined that the motion was, in fact, a traditional motion, and the movants have conceded this fact on appeal. *See Murray v. Dyke,* 41 S.W.3d 746, 751–52 (Tex.App.— Corpus Christi 2001, no pet.). Accordingly, we will review the trial court's grant of summary judgment under those well established standards. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985).

---

1. They also made a claim for constructive trust. Constructive trust is an equitable remedy that is imposed upon property obtained by fraudulent means. *Thigpen v. Locke,* 363 S.W.2d 247, 250 (Tex.1962). Because we have found no fraud, constructive trust is not available.

In a traditional summary judgment proceeding, the standard of review on appeal is whether the movant at the trial level carried the burden of showing that no genuine issue of material fact existed as to one or more elements of the nonmovant's cause or claim and that judgment should be granted as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548. In resolving the issue of whether the movant has carried this burden, all evidence favorable to the nonmovant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the nonmovant's favor. *Nixon*, 690 S.W.2d at 548–49.

## FAILURE TO PROPERLY EXECUTE THE WILL

We first address the will contestants' claim that Mr. Graham's will was not executed with the "formalities and solemnities required by the Texas Probate Code." Section 59 of the Texas Probate Code sets forth the requisites of a will. *See* TEX. PROB. CODE ANN. § 59(a) (Vernon Supp.2001). It states that, except where otherwise provided by law, a will must be (1) in writing, (2) signed by the testator and (3) be attested by two or more credible witnesses above the age of fourteen years who shall subscribe their names thereto in their own handwriting in the presence of the testator. *Id.* The will proponents provided summary judgment evidence establishing that Mr. Graham's will met those requirements.

The will itself shows that it was in writing and signed by the testator. The will proponents attached to their motion for summary judgment the affidavit of Cynthia L. Baumgardner, which stated, in relevant part:

I am employed by Margaret Hoelscher, a bookkeeper and federal tax return preparer and consultant .... I was ac- quainted with Francis John Graham, who brought his income tax information to Ms. Hoelscher for her to prepare his income tax return.

On March 8, 1996, Francis John Graham met with Margaret Hoelscher, and then he presented to me his handwritten notes on a will form dated March 6, 1996, and asked that I type up a will on a will form exactly as he had written and directed. I proceed [sic] to do so. After reviewing the Will, he asked that I, Alan Chait and Margaret Dreith, also employees of Margaret Hoelscher, act as witnesses. We three witnesses went to a nearby office where notary public Alta Garcia was asked to observe the signature and statements by Francis John Graham and each of the three witnesses, and then perform notarial services with respect to the signing of said Will. A true copy of the Will signed by Francis John Graham, and witnessed by me and the other two witnesses, and notarized by Ms. Garcia, is attached hereto.

Also, the will proponents attached to their motion the affidavit of Altagracia Garcia, the notary who signed Mr. Graham's will. She confirmed that she notarized the will, that Mr. Graham stated to her that the document was his will, that he executed it in her presence and in the presence of the three witnesses, and that the witnesses signed the will in Mr. Graham's presence and in the presence of each other.

Section 59 also provides a method for self-proving a will. *See id.* § 59(a)-(c). A will which is self-proved needs no further proof of its execution with the formalities and solemnities and under the circumstances required to make it a valid will. *See id.* § 84(a). While a self-proved will can still be challenged, the self-proving affidavit constitutes prima facie evidence of the will's execution. *See Gasaway v.*

*Nesmith,* 548 S.W.2d 457, 458 (Tex.Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.).

■ Thus, we turn to the specific question of whether Mr. Graham's will was self-proven. The will contained the following affidavit:

> We, FRANCIS JOHN GRAHAM, CYNTHIA L. BAUMGARDNER, MARGARET E. DREITH, and ALAN M. CHAIT, the testator and the witnesses, respectively, whose names are signed to the attached and foregoing instrument, were sworn and declared to the undersigned that the testator signed the instrument as his/her Last Will and that each of the witnesses, in the presence of the testator and each other, signed the will as a witness.

[Signed by the testator and the witnesses]

> On 3–8–1996 before me, Altagracia Garcia appeared Francis John Graham, Cynthia L. Baumgardner, Margaret E. Dreith, Alan M. Chait, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument. WITNESS my hand and official seal.

[Signed by the Notary Public].

An affidavit attached to a will that is in substantial compliance with the affidavit form set forth in Texas Probate Code § 59(a) will make the will self-proved. *See* TEX. PROB. CODE ANN. § 59(b) (Vernon Supp. 2001). "For this purpose, an affidavit that is subscribed and acknowledged by the testator and subscribed and sworn to by the witnesses would suffice as being in substantial compliance." *Id.* Thus, because Mr. Graham's will was subscribed and acknowledged by the testator and subscribed and sworn to by the witnesses, it is in substantial compliance with the affidavit form provided in probate code section 59(a).[2] Accordingly, the will proponents'

---

2. The form provided in section 59 is as follows:

> THE STATE OF TEXAS
> COUNTY OF _____
> Before me, the undersigned authority, on this day personally appeared _____, _____, and _____, known to me to be the testator and the witnesses, respectively, whose names are subscribed to the annexed or foregoing instrument in their respective capacities, and, all of said persons being by me duly sworn, the said _____, testator, declared to me and to the said witnesses in my presence that said instrument is his last will and testament, and that he had willingly made and executed it as his free act and deed; and the said witnesses, each on his oath stated to me, in the presence and hearing of the said testator, that the said testator had declared to them that said instrument is his last will and testament, and that he executed same as such and wanted each of them to sign it as a witness; and upon their oaths each witness stated further that they did sign the same as witnesses in the presence of the said testator and at his request; that he was at that time eighteen years of age or over (or being under such age, was or had been lawfully married, or was then a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service) and was of sound mind; and that each of said witnesses was then at least fourteen years of age.

> _____
> Testator
> _____
> Witness
> _____
> Witness
> Subscribed and sworn to before me by the said _____, testator, and by the said _____ and _____, witnesses, this _____ day of _____(SEAL) A.D. _____.
> (Signed) _____

summary judgment evidence establishes that the will was self-proven. Thus, prima facie validity of its execution was established. *See* TEX. PROB. CODE ANN. § 84(a) (Vernon 1980).

■ Once the summary judgment movant establishes its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a material fact issue sufficient to defeat summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). The nonmovant must present to the trial court any issues which would preclude summary judgment. *Id.* In reviewing the propriety of a summary judgment, we take all evidence favorable to the nonmovant as true, resolve any doubts in the nonmovant's favor, and indulge every reasonable inference in favor of the nonmovant. *Nixon*, 690 S.W.2d at 548–49. The will contestants failed to offer any evidence that raises a genuine issue of material fact regarding whether Francis Graham's will was executed with appropriate formalities. In fact, the entire depositions of all seven of the will contestants were offered by the movant, as were excerpts of those depositions offered by the will contestants themselves. None of them had any knowledge regarding the circumstances surrounding the execution of Mr. Graham's will. Thus, summary judgment was properly granted on that basis.

## LACK OF TESTAMENTARY CAPACITY

■ Next, the will contestants alleged that Mr. Graham did not have testamentary capacity when he executed his will. In order to execute a valid will,

> [T]he testator must have been of sound mind at its execution; and by this is

(Official Capacity of Officer) TEX. PROB. CODE ANN. § 59(a) (Vernon Supp.

> meant that he must have been capable of understanding the nature of the business he was engaged in, the nature and extent of his property, the persons to whom he meant to devise and bequeath it, the persons dependent upon his bounty, and the mode of distribution among them; that he must have had memory sufficient to collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive, at least, their obvious relations to each other, and be able to form a reasonable judgment as to them; and that he was not under the influence of an insane delusion, either in regard to his property or the natural and proper objects of his bounty, which affected the disposition he was about to make.

*Prather v. McClelland*, 76 Tex. 574, 13 S.W. 543, 547 (1890). This definition of testamentary capacity remains the benchmark in Texas. *See, e.g., Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex.App.— Houston [14th Dist.] 2000, pet. denied); *Guthrie v. Suiter*, 934 S.W.2d 820, 829 (Tex.App.—Houston [1st Dist.] 1996, no writ.); *Tieken v. Midwestern State Univ.*, 912 S.W.2d 878, 882 (Tex.App.—Fort Worth 1995, no writ.).

■ While even the proponent of a self-proven will retains the burden of proving testamentary capacity when offering the will for probate, once the will has been admitted to probate, the burden shifts to any contestant to establish a *lack* of testamentary capacity. *See* TEX. PROB. CODE ANN. § 88(b) (Vernon 1980) (stating that to obtain the probate of a will, the applicant must prove to the satisfaction of the court that the testator was "of sound mind"); *Croucher v. Croucher*, 660 S.W.2d 55, 57 2001).

(Tex.1983) (fact that will is self-proved does not relieve applicant for probate of the burden of establishing testamentary capacity of testator); *Woods' Estate,* 542 S.W.2d 845, 846 (Tex.1976) (burden is on contestant); *Lee v. Lee,* 424 S.W.2d 609, 612 n. 1 (Tex.1968) (after will admitted to probate, burden is on will contestants to establish incapacity by a preponderance of the evidence).

The Texas Supreme Court has said that the proper inquiry in a will contest on grounds of testamentary incapacity is the condition of the testator's mind on the day the will was executed. *Lee,* 424 S.W.2d at 611. If there is no direct testimony of acts, demeanor or condition indicating that the testator lacked testamentary capacity on the date of execution, the testator's mental condition on that date may be determined from lay opinion testimony based upon the witnesses' observations of testator's conduct either prior or subsequent to the execution. *Id.* However, that evidence has probative force only if some evidence exists demonstrating that the condition persists and has some probability of being the same condition that existed at the time the will was made. *Id.* Thus, to successfully challenge a testator's mental capacity with circumstantial evidence from time periods other than the day on which the will was executed, the will contestants must establish (1) that the evidence offered indicates a lack of testamentary capacity; (2) that the evidence is probative of the testator's capacity (or lack thereof) on the day the will was executed; and (3) that the evidence provided is of a satisfactory and convincing character, because probate will not be set aside on the basis of evidence that creates only a suspicion of mental incapacity. *See Horton v. Horton,* 965 S.W.2d 78, 85 (Tex.App.— Fort Worth 1998, no pet.).

The will proponents established as a matter of law that Mr. Graham possessed testamentary capacity at the time he signed his will. Cynthia Baumgardner stated in her affidavit that Mr. Graham approached her at her job and asked her to type up his will for him. He then executed the will in front of her and two other witnesses. She stated that Mr. Graham had written out the terms of his will and asked her to type them up exactly as he had written. This indicates Mr. Graham knew what he was doing and desired to dispose of his estate in the manner outlined in the will. Baumgardner also stated that Mr. Graham told her that day that he wanted his property to go to his two nieces, Theresa A. Carollo and Bernadette P. Jaswith, the will proponents. She also stated that Graham "was acting solely on his own without influence or presence of any family member or any other person, and he stated that he just wanted to have things done in a legal and proper way so that his Estate would go to his two nieces as set out in the Will." This evidence indicates that Mr. Graham possessed the testamentary capacity required to make a valid will.

The will proponents also attached to their motion the affidavit of Rachel Jimenez. Rachel Jimenez stated that she was acquainted with Mr. Graham for over twenty-four years, saw him almost on a daily basis during the last year of his life, and that he was "alert and coherent and knew exactly what he was doing from the time [she] first met him through his hospitalization and stay in the nursing home here in Corpus Christi just prior to his death." She stated that during the time she knew Graham, there was never a time when he was not mentally alert and capable of taking care of his own affairs. She also stated that he was "afraid of" one of his nephews that lived in Corpus Christi and would not allow that nephew to enter

his property. (The nephew referred to is one of the will contestants.) She also stated that she had to use a special phone code to contact Mr. Graham because he did not want to inadvertently answer the phone and have to talk to one of his nephews, whom he feared would be soliciting money from him. Jimenez stated that Mr. Graham disliked his nephews who lived in Corpus very much and considered them dangerous. She said Mr. Graham told her that after one of them stole money from his wallet, he had nothing more to do with them. Finally, Jimenez stated that, to her knowledge, none of the contestants visited Mr. Graham when he was in the nursing home and hospital prior to his death.

Also attached to the summary judgment was the affidavit of Alice Jimenez, who stated that she knew Mr. Graham for approximately twenty years, saw him several times during the last year of his life including one visit while he was in the nursing home, and that he was always mentally alert and of sound mind. She stated that he was capable of handling his own financial affairs from the time she met him until his death.

The affidavit of Altagracia Garcia, the notary who acknowledged Mr. Graham's will, was also attached to the proponents' motion. Garcia stated that although she only met Mr. Graham the one time, he seemed to her to know exactly what he was doing and seemed to be fully mentally competent. She also stated that as he was getting ready to leave her office, he commented that he had some nephews he did not care for.

Also attached to proponents' motion was the affidavit of Joe Adame, a neighbor of Mr. Graham's from 1982 until the time he died. Adame stated that he spoke to Mr. Graham as recently as a few months before his death and that he seemed "fully competent." He also said that although he

visited with the Graham's regularly-though not frequently-Mr. Graham never mentioned any nephews or nieces.

The affidavit of Mona Baen, a long-time friend of Mr. Graham's, was also provided. Ms. Baen stated that Mr. Graham was a family friend for years, and that she lived near the Grahams while growing up. She said that when her mother was alive, she, too, used the telephone code system with Mr. Graham so that he could avoid certain phone calls. Ms. Baen stated that she knew that Mr. Graham cared "particularly" about a niece in Chicago named Theresa, but she did not remember his mentioning any other niece in that area. She stated that Mr. Graham had related he had other nephews and nieces for whom he did not care. Ms. Baen stated that she and her mother visited Mr. Graham often when he was in the hospital suffering from his last illness. After he died, either she or her mother called Theresa in Chicago and met her plane when Theresa and her husband arrived in Corpus. She said that although Mr. Graham was "somewhat eccentric, he was always of sound mind and knew exactly what he was doing and saying, even right up until the time of his death."

That evidence negates the will contestants' allegation that Mr. Graham did not have the requisite testamentary capacity to execute a valid will in 1998. He was fully aware that he was making a will bequeathing his entire estate to his two nieces and not leaving anything to the contestants. *See Prather*, 13 S.W. at 547. By all accounts, Mr. Graham was lucid and comprehended what he was doing when he executed his will.

In contrast, the will contestants did not submit a scintilla of evidence raising a fact issue on the question of whether Mr. Graham possessed testamentary capacity at the time he executed his will. *Clear Creek*

608

*Basin Auth.*, 589 S.W.2d at 678. In fact, they made no argument whatever regarding testamentary capacity in their response and produced no evidence in that regard. Accordingly, we affirm the trial court's judgment in favor of the will proponents on the testamentary capacity cause of action.

## LACK OF INTENT TO MAKE A WILL

▆▆▆ Next, the will contestants alleged that Mr. Graham did not possess the required testamentary intent when he executed his March 1996 will. A document is not a will unless it is executed with testamentary intent. *Hinson v. Hinson*, 154 Tex. 561, 280 S.W.2d 731, 733 (1955). "To give the instrument the legal effect either of a will or other revocation of former wills it must be written and signed with the present intention to make it a will or revocation." *Brackenridge v. Roberts*, 114 Tex. 418, 267 S.W. 244, 246 (1924); *see also Hinson*, 280 S.W.2d at 733. "It is essential ... that the maker shall have intended to express his testamentary wishes in the particular instrument." *Hinson*, 280 S.W.2d at 733. This concept has been explained to mean that in order for a document to possess the requisite testamentary intent, it must be evident that the testator intended that the very document at issue to be the instrument that actually makes the disposition of the testator's estate. *See id.*, 280 S.W.2d at 735–36; *In re Sorenson's Estate*, 370 S.W.2d 225, 228–29 (Tex.Civ.App.—El Paso 1963,writ ref'd n.r.e.). A document that merely evidences an intention to dispose of the property is not a will. *Hinson*, 280 S.W.2d at 735–36.

We find abundant evidence that Mr. Graham intended the document signed on March 8, 1996, to be his will. Not only does the language on the document itself clearly indicate that it is Mr. Graham's Last Will and Testament, but it clearly bequeaths his estate to his two nieces. The will was properly executed, witnessed and self-proven. Also, the summary judgment evidence previously discussed shows that Mr. Graham intended the document he signed in March 1996 to be his will. The notary and a witness both stated that he knew he was signing his will and he asked them to witness and acknowledge it for him. Further, Cynthia Bumgardner stated in her affidavit that Mr. Graham approached her and asked her to re-type the handwritten will that he had made out. The fact that he wrote it out by hand before having it typed up indicates that Mr. Graham intended the document to be his will and understood the contents of the document. We hold that the will proponents have established their right to judgment on the issue of testamentary intent. Again, the will contestants offer no argument or evidence on the issue of testamentary intent in their response to the motion for summary judgment. Accordingly, they raised no evidence asserting a genuine issue of material fact that defeats the will proponents' right to judgment. We affirm the trial court's summary judgment on the claim of lack of testamentary intent.

## MISTAKE AS TO CONTENTS OF INSTRUMENT

▆▆▆ The will contestants also alleged that Mr. Graham was mistaken about the contents of his will. We can discern no indication that a mistake occurred in Mr. Graham's will. "A will is a unilateral instrument, and the court is concerned only with the intention of the testator as expressed in the document." *Stewart v. Selder*, 473 S.W.2d 3, 7 (Tex.1971). We find the intention of Mr. Graham is quite clear from the language of the instrument. The will proponents offered further proof indicating that he intended exactly what the document said. Again, the will contestants did not offer argument

or evidence regarding their allegation of mistake in their response. They thus failed to defeat the movants' right to judgment on this issue. Accordingly, we affirm the trial court's judgment in favor of the will proponents on this issue.

## UNDUE INFLUENCE

The will contestants also alleged that Mr. Graham's will should be set aside because it was a result of the undue influence of Graham's nieces from Chicago. Before a will can be set aside because of undue influence, the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of that influence so as to subvert or overpower the testator's mind at the time of the execution of the testament; and (3) the execution of a testament which the maker would not have executed but for such influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex.1963). Not every influence exerted on a person is undue. *Id.* It is not undue unless the free agency of the testator was destroyed and the will produced expresses the wishes of the one exerting the influence. *Id.* "Indeed, it has even been held that one may request or even importune, or entreat another to create a favorable dispositive instrument, but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence." *Id.*

Courts have long recognized that the exertion of influence that was or became undue is usually a subtle thing and by its very nature usually involves an extended course of dealings and circumstances. *Id.* Thus, it may be proved by circumstantial evidence. *Id.*

In the absence of direct evidence all of the circumstances shown or established by the evidence should be considered; and even though none of the circumstances standing alone would be sufficient to show the elements of undue influence, if when considered together they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion. *However, the circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence.* This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing.

*Id.* at 922–23 (internal citations omitted) (emphasis added).

Factors to be considered when determining whether undue influence exists in a particular case are:

(1) the nature and type of relationship existing between the testator, the contestants and the party accused of exerting such influence;

(2) the opportunities existing for the exertion of the type of influence or deception possessed or employed;

(3) the circumstances surrounding the drafting and execution of the testament;

(4) the existence of a fraudulent motive;

(5) whether there has been an habitual subjection of the testator to the control of another;

(6) the state of the testator's mind at the time of the execution of the testament;

(7) the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

(8) words and acts of the testator;

(9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise;

(10) whether the testament executed is unnatural in its terms of disposition of property.

*Id.* at 923; *see also Guthrie,* 934 S.W.2d at 831 (adding the factor of whether the beneficiary took part in the execution of the will); *Mackie v. McKenzie,* 900 S.W.2d 445, 449 (Tex.App.—Texarkana 1995, writ denied) (same). Although a contestant may prove undue influence by circumstantial evidence, the evidence must be probative of the issue and not merely create a surmise or suspicion that such influence existed at the time the will was executed. *Guthrie,* 934 S.W.2d at 831; *see also Rothermel,* 369 S.W.2d at 922.

We find the record devoid of any evidence of undue influence. Taking the evidence produced by the nonmovants as true and resolving every doubt and inference in their favor, the facts relevant to their undue influence claim are as follows. The will contestants are the seven children of Mr. Graham's half-sister, Josephine, who died in 1971. Before her death, Mr. Graham was close to her, and treated her as if she were a full sister as far as her children knew. Mr. Graham would visit with the family and occasionally bring gifts to the children. He invited them to move to Corpus Christi to help with his bait stand, and after Josephine died, they did. Several of the siblings worked with Mr. Graham at the bait stand on and off until Graham stopped working there. During the 1990's, the will contestants maintained infrequent contact with their uncle.

The seven siblings were in and out of the Corpus Christi area over the next three decades. Harold Hoffman, a longtime friend of Francis Graham's, testified that while the will contestants were working the bait stand with the Grahams they seemed like "one big family." Although Graham was a very private man, he was open and very friendly with the will contestants. They found this to be the case whenever they encountered him at places around town like the grocery store and a local restaurant. A few years before his death, a group of them saw him at the Old County Buffet Restaurant, and he sat down and visited with them for around an hour. A friend of Mr. Graham's at the time he ran the bait stand said that he never heard Graham mention any other nieces or nephews other than the will contestants.

Everyone who testified regarding Mr. Graham regarded him as a very private man. The will contestants maintained that they honored his privacy by not going to his home to visit him, but denied any knowledge that they were forbidden from going there. They also did not call him on the phone because he was difficult to reach by phone. None of the will contestants had much contact with him in the several years prior to his death. In fact, they did not know of his wife's death in 1993 until they learned of his own death in 1999, which was a year after it occurred.

The will contestants testified further that although Mr. Graham did not have a close relationship with the nieces in Chicago, one of them "took it upon herself" to become the member of the family who maintained contact with Mr. Graham. Leroy Noack, one of the contestants, stated that in 1993, this niece approached him at a family function and inquired about the size of Graham's estate. After that inquiry, she began keeping up with Mr. Graham. Leroy Noack also stated that this niece told him she told Mr. Graham that if he did not keep up contact with her, she would send the police out to check on him. The will contestants were all shocked that

she did not notify any of them upon their uncle's death and believed that she had tried to conceal it from them.

Finally, the will contestants offered testimony to the effect that when they saw Mr. Graham over the past few years of his life, he seemed to be declining mentally. One of the sisters testified that she saw him in the grocery store after his wife's death, and spoke as if his wife was still alive. One of the brothers testified that Mr. Graham appeared to not recognize him completely when he saw him at the restaurant once, and seemed to mistake him for another brother. The will contestants argue that if Mr. Graham actually said that he did not care for them, as related by some of the other witnesses, "he would not have engaged in the friendly and open conduct toward them" that they describe.

None of the will contestants had any knowledge regarding the specific circumstances surrounding the execution of Mr. Graham's will. None of them had ever been promised by Mr. Graham that he would leave anything to them in a will. They contend that the fact that he was warm to them and had a distant relationship with the nieces to whom he left his estate, in effect, raises an issue of material fact regarding undue influence. We disagree. Rather, we hold that evidence produced by the will contestants is not sufficient to raise a genuine issue of material fact on the issue of whether Mr. Graham's will was executed as a result of undue influence.

 "A solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing." *Rothermel*, 369 S.W.2d at 922–23. The will proponents offered ample evidence showing that Mr. Graham made out his will voluntarily and that it reflected the manner he wanted to distribute his estate. Several witnesses gave opinions that he seemed lucid and coherent and able to comprehend what he was doing in making out the will. Circumstances that are as consistent with a will executed free from improper influence as they are with a will resulting from undue influence cannot be considered as evidence of undue influence. *Guthrie*, 934 S.W.2d at 832. Theresa Carollo's inquiry regarding Graham's estate in 1993 is equally consistent with the actions of a concerned and responsible, albeit distant, relative as they are with a sinister plot to duress Mr. Graham into leaving everything to her and her sister. The will contestants all admitted they did not maintain regular contact with Mr. Graham. Essentially, all their evidence amounts to nothing more than a mere surmise or suspicion that Theresa Carollo exerted undue influence which caused Mr. Graham to execute the will leaving everything to the two nieces in Chicago. The will contestants did not offer a scintilla of evidence showing either that undue influence, in fact, existed, nor any evidence of Mr. Graham's state of mind at the time the will was executed that would tend to show his free agency was overcome by such influence. *See Rothermel*, 369 S.W.2d at 922. "The exertion of influence that was undue cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was not only present but that it was in fact exerted with respect to the making of the testament itself." *See id.* at 923. This is not enough to defeat a motion for traditional summary judgment when the movants have offered ample evidence establishing the absence of undue influence. We affirm the trial court's grant of summary judgment on this cause of action as well.

FRAUD

■ Finally, the will contestants alleged that Mr. Graham's will was executed as a result of fraud. A claim that a will was procured through fraud requires proof of some kind of misrepresentation. *See Guthrie*, 934 S.W.2d at 832–33. The will proponents offered ample evidence to show that Mr. Graham's will was not the result of any type of fraud. The will contestants offered no controverting evidence showing any type of misrepresentation. Accordingly, we affirm summary judgment on the fraud claim.

The will proponents' motion for summary judgment is hereby AFFIRMED in all respects.