

# NUMBER 13-12-00026-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE ESTATE OF RALPH LEE MINTON, DECEASED

### On appeal from the Probate Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Longoria
### Memorandum Opinion by Chief Justice Valdez

This appeal arises out of the probate court's declaratory judgment ordering that the funds in the accounts of the deceased Ralph Lee Minton (Minton) are the property of his estate. By seven issues, appellant, Artemio E. Garza (Garza), appeals the judgment in favor of appellees, Randall Lee Minton, individually and as Independent Administrator of the Estate of Ralph Lee Minton, Glenda Marcelle Todd, Beverly Regina Alford, and Wanda Lynn Smith (Beneficiaries). Garza argues that the trial court erred in its judgment and denial of his motion for new trial because: (1) the evidence was legally and factually

insufficient to support the jury's finding that Ralph Lee Minton lacked legal capacity to enter into contracts with First National Bank designating Garza as the beneficiary of his accounts; (2) the trial court reversibly erred by admitting evidence that was irrelevant, cumulative, and contained hearsay; (3) the trial court lacked subject matter jurisdiction; (4) a declaratory judgment was not an available remedy under the circumstances; (5) Beneficiaries failed to request a jury question or provide evidence regarding whether Minton disaffirmed the contracts; (6) Beneficiaries failed to plead rescission; and (7) Beneficiaries failed to provide evidence that they lacked an adequate remedy at law. We affirm.

## I. BACKGROUND

### A. Procedural History

On December 2, 2010, Minton passed away, intestate, leaving a checking account and four Certificates of Deposit (C.D.(s)) totaling $432,968.73 at First National Bank (First National). On March 25, prior to his death, Minton entered into payable on death (P.O.D.) contracts with First National. The P.O.D. contracts designated Garza, a retired law enforcement officer who had been friends with Minton since February 2007, as the beneficiary of his account and three of his C.D.s at First National.[1] On December 10, 2010, the estate filed an "Application for Independent Administration and Application to Determine Heirship" concerning the account and C.D.s at First National. On December 16, 2010, Garza, relying on the P.O.D. designations, retrieved the funds from the bank account and C.D.s at First National. On December 17, 2010, Beneficiaries filed an

---

[1] There is a dispute over whether the P.O.D. contracts named Garza the beneficiary of the fourth C.D. The jury did not resolve the controversy over the remaining C.D. because it found that Minton lacked capacity to enter into any of the P.O.D. contracts, and we do not address that dispute because we affirm their finding on capacity.

2

"Original Petition and Application for Temporary Restraining Order" in which they claimed that Minton lacked capacity to enter into the P.O.D. contracts because he "was of unsound mind" and "could be taken advantage of and easily manipulated." Beneficiaries also requested that First National be precluded from transferring any further estate assets to the Beneficiaries of the P.O.D. contracts and that Garza be restrained from spending any of Minton's funds.

Garza made a verified plea arguing that the Beneficiaries lacked standing because they had no justiciable interest in the claims asserted. Garza further filed a "counterclaim" that the Beneficiaries had "neither capacity nor standing to bring the present action."

On December 21, 2010, the trial court held a hearing on Beneficiaries' application for temporary injunction, and on January 12, 2011, the trial court issued a temporary injunction enjoining Garza from spending or dissipating any funds he received from Minton's accounts.[2] On August 1, 2011, the trial court granted partial summary judgment in favor of Garza dismissing "the issue of undue influence and all references thereto." The trial court commenced a jury trial on Beneficiaries' remaining causes of action on August 2, 2011. On August 5, 2011, Beneficiaries filed their second supplemental petition, asserting that the P.O.D. designations should be declared void because Minton lacked the requisite mental capacity to execute them and praying that the trial court declare that the funds were the property of Minton's estate.

---

[2] We affirmed the temporary injunction in *In re Estate of Minton*, No. 13-11-00062-CV, 2011 WL 2475394, at * 4 (Tex. App.—Corpus Christi June 23, 2011, no pet.) (mem. Op.).
.

3

## B.    Evidence at Trial

At trial, Beneficiaries provided evidence of Minton's mental incompetence from January 2010 through May 2010. The evidence indicated that Minton stayed at McAllen Nursing Center from January 23 to January 24, 2010. The nurse's notes admitted into evidence indicated that Minton was alert and able to follow directions, but also that he was uncooperative and confused during his visit. On January 26, Minton was brought back to the McAllen Nursing Center in an ambulance.

A few days later, Minton was sent to Legends Transitional Nursing Home (Legends). The nursing home's records indicated that Minton was alert, but forgetful and demanding. An "Elopement Risk Assessment," signed by the attending physician, indicated that Minton was cognitively impaired with poor decision making skills, and his "Fall Risk Assessment" indicated that he had "intermittent confusion." The nurse's notes stated that Minton complained that he was having a heart attack and that he would know because he claimed he was a heart surgeon.

On January 28, 2010, Minton was sent from Legends to McAllen Heart Hospital. Heart Hospital's admitting diagnosis stated that Minton had senility. The hospital's records stated that a psychiatric evaluation was performed by a doctor on February 3, 2010 which concluded, "At this time, the patient is capable to make decision [sic] regarding his health. He might have poor judgment and wanted to go home without proper assistance." Sue Cook, case manager for McAllen Heart Hospital, testified that she had contact with Minton around January or February 2010. She testified that Minton was sick but refused nursing assistance.

Minton was admitted to McAllen Nursing Home on February 5, 2010. The admission notes indicated that Minton was alert but forgetful and confused. According to the nurse's notes, Minton was discharged on his own request from the nursing home the next day, after being instructed on the risks of leaving.

In early February, Adult Protective Services (APS) was contacted with concerns about Minton. Margot Barriero, a specialist for APS, testified at trial that she investigated charges that Minton's friend had exploited Minton and that Minton had neglected to care for himself. APS found that the exploitation charges were unfounded. Barriero testified that, during her home visit, Minton behaved irrationally and did not have good judgment, but was capable of making some of his own decisions. She testified that he was verbally abusive towards her and called the police to have her removed. She testified that although he could not leave his bed, Minton did not want nursing care and wished to stay by himself. She stated that she closed Minton's case because he obtained twenty-four hour nursing care. Additionally, Bernabe Balli testified that he assisted Minton by running errands for him. He testified that on February 6, 2010, he called the police because he did not believe Minton should be left alone.

John Tisdale, Minton's long-time friend, testified that in January 2010, Minton had problems thinking and making decisions, was easily agitated, and would not allow health care workers to assist him. He testified that he often had employees run errands for Minton, but that it was difficult to find help because Minton was rude to anyone who helped him. Tisdale testified that Minton was bed-ridden and would stay for hours in his own feces and urine, but would refuse to be cleaned and would request that the police be called to have his healthcare workers removed. Tisdale testified that he informed Minton

5

that he was not thinking right and needed help. Tisdale concluded that Minton lost his mental capacity in January 2010 when Minton filed a restraining order against him.

Randall Lee Minton, Minton's son and the independent administrator of his estate, agreed that his father could be abusive and stated that he had not spoken with his father since 2007. He admitted that Garza had more knowledge of Minton's mental state than he did. Additionally, Beverly Minton Alford, Minton's daughter, testified that she had stayed with Minton from February 20, 2010 through March 8, 2010, that their family had a history of mental illness, that she witnessed Minton strike a medical provider, and that Minton would become angry and yell obscenities. She further testified that Minton made decisions that made no sense, and that she had to trick Minton into signing a check to pay for his home health care, which she testified that he never would have signed had he been mentally competent because he had always been very meticulous with his finances. She stated that, earlier in his life, Minton was always up to date with all of his accounts and C.D.s and that he once became angry at a bank employee because a date was missing on a financial document.

Paul Lopez, a caretaker for Minton's healthcare provider, testified that he cared for Minton from February 22, 2010 to March 10, 2010. He stated that Minton was a horrible man, that he was paranoid and would see and speak to people who were not in the room, and that he would request food items that he saw on television and drink curdled milk that was far past its expiration date. Lopez testified that Minton once punched him and broke his glasses. He stated that on March 3, Minton told him he wanted to go for a drive in Minton's car that was parked outside even though Minton no longer owned a car. He

6

further testified that Minton refused to take care of his personal hygiene, and that Minton would often have his hands in his pants and get urine and feces under his fingernails.

Beneficiaries presented evidence that on March 26, 2010, the day after Minton signed the P.O.D. contracts, he was admitted to the emergency room at McAllen Heart Hospital. The hospital admission documents stated that Minton was unable to sign the documents, and therefore Lopez had to sign the documents as a witness. The hospital records also indicated that Minton had "adjustment disorder."

Pedro Hugo Gonzalez, an APS specialist, contacted Minton in early May 2010. He testified that he made several home visits to check on Minton. He stated that he believed that Minton could not care for himself due to physical disabilities. Also, APS worker Belinda Cantu conducted an investigation and generated a report on Minton in May of 2010. She testified that she investigated Minton because he had no one to care for him. She stated that Minton refused to speak to her and accused her of trying to conspire against him. She admitted that she is not qualified to make a medical diagnosis, but testified that Minton was neglecting himself and made irrational decisions.

Furthermore, Francesco Jimenez, supervisor for APS, testified that he investigated Minton's case from May 10, 2010 to May 17, 2010. He stated that Minton could not accept that he could not care for himself, that APS closed their case on Minton when he was admitted into a nursing home, and that he ordered a psychological assessment of Minton. Jimenez stated that the investigation determined that Minton would have been left at-risk had he stayed at home because he was not making rational decisions. The intake sheet from the investigation indicated that Minton had a mental illness. On cross-examination, Jimenez explained that the mental illness listing on the report was not a medical diagnosis

7

but that "mental illness" was listed on the document because the case investigators determined that Minton was not making rational decisions.

Beneficiaries provided medical records indicating that on May 11, 2010, APS referred Minton to Dr. Jose Alfonso Lopez who assessed Minton with senile dementia. At trial, Dr. Lopez testified that he did not have an independent recollection of Minton, but his records indicated that he had a reasonable basis for assessing him with senile dementia. Dr. Lopez stated that, "Dementia is the loss of mental capacity, the lack of judgment, and basically that's what dementia is." On cross-examination, he testified that the records indicated that Minton had completed a "Patient Self Determination Record" which meant that someone at the hospital had deemed that Minton was competent to execute the document. He testified that Minton had also completed other hospital forms which were similar in effect to legally binding contracts.

Further, Beneficiaries provided evidence that, on May 19, 2010, Dr. Iran Barrera completed a mental health assessment of Minton, in which she concluded that Minton did not have the mental or emotional capacity to care for himself. Additionally, Dr. David Moron, the Beneficiaries' retained expert, testified that after reviewing Minton's records, he determined that his conduct and symptoms were consistent with dementia. He further explained that Minton did not have sound judgment or the ability to manage his financial affairs in March of 2010. On cross-examination, Dr. Moron explained that dementia is not an illness but a conglomeration of symptoms.

In support of Minton's capacity to contract, Garza testified that Minton was mentally alert and had good judgment at the time he signed the contracts. He explained that on March 25, 2010, he dialed First National's phone number and handed the phone to

8

Minton, who asked the bank to send representatives. Garza stated that he was present when Minton signed the P.O.D documents. Further, Gail Cappadona, representative of First National, and Brad Williams, First National Branch President, testified that they brought the P.O.D. contracts to Minton's house on March 25, 2010. They recounted that Cappadona explained the P.O.D. contracts to Minton and that Minton understood what he was doing when he executed them. Both believed that Minton was mentally competent to enter into the contracts. Both also testified that they would not have allowed someone who was not of sound mind to sign contracts.

Marilia Luz, a health care provider who cared for Minton from February 22, 2010 through March 27, 2010, testified that she had a good relationship with Minton. She testified that Minton called to inquire about Luz after she sustained injuries in a car crash and was unable to work for a few days. She stated that, on March 25, 2010, she visited Minton to inform him that she was fine. She testified that, on March 25, 2010, she had an intelligent discussion about the car accident with Minton, and that Minton was familiar with the location of the car accident and asked whether the other driver involved in the accident had liability insurance. She testified that on that date, Minton had a good grasp on reality and was mentally competent.

Juan Martinez, a registered nurse at Briarcliff Nursing and Rehab Center (Briarcliff), testified that he performed a mental competency assessment on Minton in April 2010. He stated that based on his assessment, Minton was competent and oriented, and that Minton was able to answer all of his questions. Martinez explained that after the evaluation, he had a conversation with Minton that lasted between 45 minutes to an hour. He stated that they discussed the cost breakdown of getting a room at Briarcliff and that

9

Minton was very aware of his finances. Furthermore, Dr. Jetta Marie Brown, Garza's retained expert medical witness, testified that Minton was not suffering from dementia, and that there was no basis to believe that Minton was mentally incompetent on March 25, 2010 when he signed the P.O.D. contracts.

At the close of evidence, the jury rendered a finding that Minton lacked legal capacity to enter into the P.O.D. contracts, and the trial court entered a final judgment on November 2, 2011 ordering that the funds from Minton's accounts and C.D.s were the property of Minton's estate. Garza filed a motion for new trial in which he argued that there was legally and factually insufficient evidence to support the jury's finding on Minton's capacity to contract and that the trial court erred by admitting medical records and testimony concerning Minton's mental capacity on dates other than March 25, 2010, when he signed the P.O.D. contracts. The trial court denied his motion for new trial. This appeal followed.

## II. LEGAL AND FACTUAL INSUFFICIENCY

In his first issue, Garza contends that the evidence required impermissible inferences by the jury and was therefore insufficient to support the jury's finding that Minton lacked capacity to contract when he signed the P.O.D. contracts on March 25, 2010. We disagree.

### A. Standard of Review & Applicable Law

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). We may not sustain a legal

10

sufficiency or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* at 810.

In reviewing the factual sufficiency of the evidence, we consider all of the evidence presented by both parties, and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex. 1998). As the fact finder, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*

The burden of proof rests with the party seeking to set aside a contract for lack of mental capacity. *See Decker v. Decker,* 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.). "The legal standards for determining the existence of mental capacity for the purposes of executing a will or deed are substantially the same as the mental capacity for executing a contract." *Bach v. Hudson*, 596 S.W.2d 673, 675 (Tex. Civ. App.—Corpus Christi 1980, no writ).

To possess "mental capacity" to contract, Minton, at the time of contracting, must have "appreciated the effect of what he was doing and understood the nature and consequences of his acts and the business he was transacting." *See Mandell & Wright v. Thomas,* 441 S.W.2d 841, 845 (Tex. 1969); *In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex. App.—Corpus Christi 2004, pet. denied). Mental capacity, or lack thereof, may be shown by "circumstantial evidence, including: (1) a person's outward conduct,

11

manifesting an inward and causing condition; (2) any pre-existing external circumstances tending to produce a special mental condition; and (3) the prior or subsequent existence of a mental condition from which a person's mental capacity (or incapacity) at the time in question may be inferred." *In re Estate of Robinson*, 140 S.W.3d at 788 (quotations omitted). As a general rule, the question of whether a person, at the time of contracting, knows or understands the nature and consequences of her actions is a question of fact for the jury. *Id.* at 793−94.

**B.    Trial Court's Consideration of Evidence of Minton's Mental Capacity Before and After Execution of the Contracts**

Garza first contends that the jury "was barred by law from giving weight" to evidence of Minton's mental competency prior to or after March 25, 2010, the date Minton signed the P.O.D. contracts. Garza argues that even though the P.O.D. contracts were not a will, the law from the Texas Supreme Court case *Lee v. Lee*, which related to a will contest, is applicable. *See Lee v. Lee,* 424 S.W.2d 609, 611 (Tex. 1968). Given that the legal standard for determining testamentary capacity and capacity to contract are substantially the same, we agree that this law is applicable. *See Bach,* 596 S.W.2d at 675−76.

In *Lee*, the Texas Supreme Court determined that the proper inquiry in a will contest on grounds of testamentary incapacity is the condition of the testator's mind on the day the will was executed. *Lee,* 424 S.W.2d at 611. If there is no direct testimony of acts, demeanor, or condition indicating that the testator lacked testamentary capacity on the date of execution, "the testator's mental condition on that date may be determined from lay opinion testimony based upon the witnesses' observations of testator's conduct either prior or subsequent to the execution." *Id.* However, that evidence has probative

12

force only if some evidence exists demonstrating that the condition persisted and had some probability of being the same condition that existed at the time the will was made. *Id.*

Thus, to successfully challenge a testator's mental capacity with circumstantial evidence from time periods other than the day on which the will was executed, the will contestants must establish (1) that the evidence offered indicates a lack of testamentary capacity; (2) that the evidence is probative of the testator's capacity (or lack thereof) on the day the will was executed; and (3) that the evidence provided is of a satisfactory and convincing character. *See In re Estate of Graham*, 69 S.W.3d 598, 606 (Tex. App.—Corpus Christi 2001, no pet.); *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.).

Garza argues that this case law indicates that the trial court was precluded from considering evidence of Minton's mental condition prior and subsequent to March 25, 2010 because Garza presented testimony that Minton was mentally competent at the time the contracts were made. However, the cases cited by Garza explicitly state that evidence form other dates *can* be considered if there is no evidence that the testator *lacked* legal capacity to contract on the date it was executed. In fact in *Lee*, the court determined that it could consider evidence, despite the fact that there was no evidence of capacity from the date the will was executed. *Lee,* 424 S.W.2d at 611. Moreover, in *In re Estate of Graham*, in which this Court followed *Lee*, we considered both evidence of testamentary capacity on the date a will was signed and before and after that date. *See In re Estate of Graham*, 69 S.W.3d at 606. Garza cites no case precluding the jury from considering or giving weight to evidence under any circumstance, much less solely

13

because the party seeking to uphold the contract presents its own testimony of competence. Accordingly, we hold that the jury was entitled to consider evidence of Minton's mental capacity prior and subsequent to the execution of the P.O.D. contracts if the trial court could have considered it probative and relevant to his mental state on March 25, 2010. *See id.*; *Lee*, 424 S.W.2d at 611; *Horton*, 965 S.W.2d at 85. And as discussed below, we determine that the jury could have found this evidence probative.

## C.    Sufficiency of the Evidence

Garza argues that "even if the evidence of Minton's pre and post March 25, 2010 execution conduct are considered, [Beneficiaries] failed to prove Minton's lack of mental capacity on March 25, 2010." Beneficiaries presented evidence of Minton's mental incapacity showing that in the month of and the months before and after he signed the P.O.D. contracts, Minton refused medical treatment even though he was bed-ridden and needed it, that he spoke to people who were not there, that he sat for hours in his own feces and urine, and that medical providers indicated that he was confused and senile. They further provided evidence that on the day after he signed the P.O.D. contracts, he was unable to sign himself into a hospital and that less than two months later he was assessed with senile dementia. While this is evidence of Minton's conduct and condition prior and subsequent to March 25, the jury was entitled to infer that evidence of Minton's irrationality and dementia in the months preceding and following the signing of the contract were probative of his capacity to contract on the date the contract was signed. *See In re Estate of Robinson*, 140 S.W.3d at 788; *In re Estate of Graham,* 69 S.W.3d at 606. Beneficiaries also elicited testimony from their expert that Minton was mentally incompetent in March 2010.

14

Moreover, while Garza elicited testimony from witnesses who claimed Minton was competent on the date the contract was signed, it was the jury's responsibility to judge the credibility of the witnesses and determine the weight to be given their testimony. *See Maritime Overseas Corp.*, 971 S.W.2d at 406–07. Accordingly, we conclude that the evidence supporting the jury's finding that Minton lacked capacity to contract was not "so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust," *see id.*, and the evidence was legally and factually sufficient to support the jury's finding. *See id.*; *Wilson,* 168 S.W.3d at 827. Garza's evidentiary sufficiency issue is overruled.

### III. ADMISSIBILITY OF EVIDENCE

Garza contends that the trial court erred by admitting Beneficiaries' "Exhibit 1," which consisted of over 1,200 business records concerning Minton and his health. We disagree.

### A. Relevance and Materiality

At trial, when Beneficiaries sought to admit "Exhibit 1," Garza's attorney objected, stating that Beneficiaries' attorney was "correct that they have complied with [rule] 803 with the filing of the affidavit; however, simply because a record meets the hearsay requirement of 803 does not make it automatically admissible. It still has to meet the other requirements of admissibility, those being, among other things, relevancy and materiality." *See* TEX. R. EVID. 803. Garza's attorney further explained that several of the documents in the exhibit related to occurrences after March 25 that should not have been admitted "because if there's a medical record indicating that something was wrong with Mr. Minton, for instance, in August of 2010 or July 2010 or October of 2010, that does not

15

in any way provide any indicia of what he was on March 25th of 2010." He then argued that under *Lee*, discussed above, this evidence was irrelevant because it did not concern Minton's mental state on the date he signed the contract. The trial court overruled Garza's objection and admitted "Exhibit 1." Immediately after this, when Beneficiaries' attorney referred to the contents of the exhibit, Garza's attorney stated generally, "Judge, I would renew my objection on the basis of materiality, relevance and the records contain hearsay statements, which should not be allowed."

On appeal, Garza first argues that the trial court abused its discretion by overruling his relevance objection under *Lee*. *See* 424 S.W.2d at 611. However, we have explained that *Lee* does not stand for the proposition that the jury is precluded from considering mental incapacity evidence from dates prior or subsequent to the signing of a contract. *See id.* And we have held that the evidence presented in this case relating to incidents before and after March 25, were probative of Minton's capacity to enter into the P.O.D. contracts. Accordingly, Garza's issue regarding his relevancy objection is overruled.

## B. Hearsay, Cumulative Evidence, and Best Evidence Objections

Further, Garza argues, on appeal, that the trial court erred by admitting "Exhibit 1" because its contents contained hearsay, were cumulative, and violated the best evidence rule. In his brief, Garza refers to two other objections to "Exhibit 1" made later during trial, one on hearsay grounds and the other on cumulative and best evidence grounds.

However, Garza's objection that one of the documents admitted as part of "Exhibit 1" contained hearsay was not sufficient to preserve error for our review because the entire exhibit had already been admitted without a specific hearsay objection from Garza's attorney. *See* TEX. R. APP. P. 33.1. Garza's attorney's statement directly after the exhibit

16

had been admitted that he was renewing his objection "on the basis of materiality, relevance, and the records contain hearsay statements" did not specifically indicate which statements in the over 1,200 business records in "exhibit 1" constituted hearsay and therefore did not preserve the hearsay argument at the time the exhibit was admitted. *See id.*

Turning to Garza's best evidence and cumulative evidence objections, during Garza's testimony at trial, Beneficiaries' attorney questioned him regarding medical documents in "Exhibit 1" that indicated that Minton was mentally incompetent. Garza's attorney objected on the grounds that the testimony was cumulative and the "medical records were the best evidence of what the medical records indicate." On appeal, Garza argues that it was error for the court to overrule his objection. However, Beneficiaries' counsel referenced the medical records to impeach Garza on his testimony that Minton was mentally competent, not to provide further evidence of the contents of the medical records. *See* TEX. R. EVID. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required except as otherwise provided in these rules or by law"). The testimony therefore was not cumulative and did not violate the best evidence rule.

Moreover, on appeal, Garza makes the conclusory statement that the trial court's errors "resulted in prejudice to [Garza] and caused the rendition of an improper judgment." *See* TEX. R. APP. P. 44.1. The evidence subject to Garza's hearsay objections related to a record of a phone conversation received by one of Minton's medical providers. On appeal, Garza does not recount the contents of the record of the conversation, nor does he explain how its admission caused the rendition of an improper judgment. *See id.*

17

38.1(i) (requiring an appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). Additionally, Garza does not explain how, and we do not find that, Beneficiaries' attorney's reference to the medical records during Garza's testimony probably caused the rendition of an improper judgment. *See id.* 44.1. We therefore conclude that any error resulting from the admission of evidence that was hearsay, cumulative, or a violation of the best evidence rule, was not harmful. *See id.*

## C. Trial Court's Alleged Failure to Properly Examine "Exhibit 1"

Garza also alleges that "the trial court abused its discretion in allowing [Beneficiaries ] to introduce over 1,200 documents . . . (1) without first hearing any evidence concerning the contents of the records, or the [sic] how such records related to the issues in the case; (2) without conducting any examination of the contents of the records; (3) without determining whether there were any hearsay statements in the records; and (4) simply relying on statements of counsel to answer the issues raised in 1, 2 and 3 above." Garza, in his brief, however, cites no law requiring the trial court to follow any of these procedures before admitting evidence. *See* Tex. R. App. P. 38.1(i). Moreover, Garza did not preserve this argument because he failed to object to the trial court's failure to follow the procedures Garza now claims were required before admitting it. *See id.* 33.1.

For the foregoing reasons, Garza's issue regarding the improper admission of evidence is overruled.

## IV. SUBJECT-MATTER JURISDICTION

Garza argues that the trial court did not possess subject-matter jurisdiction over Beneficiaries' claims and application for temporary injunction. Garza first argues that only a representative of an estate has capacity to sue to recover estate property and that therefore Randall Minton, as independent administrator, was the only party with capacity to sue. *See Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998). However, regardless of whether the heirs had capacity to sue or were properly listed as plaintiffs, we cannot reverse or alter the declaratory judgment on capacity grounds because Randall Minton, as administrator of the estate, had capacity to sue for the declaratory relief, *see id.*, and the judgment specifically declared the funds to be the property of the estate. *See* TEX. R. APP. P. 25.1(c).

Additionally, Garza's claim regarding the trial court's jurisdiction to issue the temporary injunction is not properly before us because Garza is not currently appealing from the temporary injunction. Moreover, the temporary injunction enjoined Garza from spending funds received from the P.O.D. accounts. Because the trial court has now declared that the funds are part of Minton's estate, any argument regarding error in the injunction is now moot. *City of Corpus Christi v. Cartwright*, 281 S.W.2d 343, 344 (Tex. Civ. App.—San Antonio 1955, no writ).

Garza also contends that the trial court did not have jurisdiction to declare the P.O.D. contracts void because the contracts were nontestamentary transfers and were therefore not subject to provisions of the probate code. *See* TEX. PROB. CODE ANN. § 441 (West Supp. 2011). We agree that the sections of the probate code, applicable at the time Beneficiaries' suit was filed, show that P.O.D. contracts are nontestamentary

19

transfers and not subject to the provisions of the probate code. *See id.* However, Garza has cited no authority supporting the proposition that because provisions of the probate code do not apply, the probate court lacks subject-matter jurisdiction. *See* TEX. R. APP. P. 38.1(i). Moreover, here, the probate court was determining whether the funds were part of the estate and therefore was deciding a matter "related to a probate proceeding," over which a probate court has jurisdiction. *See* TEX. PROB. CODE ANN. § 4F (West Supp. 2011).

Accordingly, Garza's subject-matter jurisdiction issue is overruled.

## V. GARZA'S REMAINING ISSUES

Garza argues that the trial court erred because a declaratory judgment was an improper remedy under these circumstances and because Beneficiaries failed to request a jury question or provide evidence regarding whether Minton disaffirmed the contracts, failed to plead rescission, and failed to provide evidence that they lacked an adequate remedy at law. We disagree.[3]

Texas law authorizes courts to enter declaratory judgments to determine questions of the construction and validity of a contract. TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (West 2008). This court has affirmed multiple judgments declaring that contracts entered into by parties that subsequently passed away were void without determining that the party seeking the judgment needed to plead rescission or provide evidence that the contract was disaffirmed. *See In re Estate of Robinson*, 140 S.W.3d at 788; *see also Korenek v. Korenek*, No. 13-07-00111-CV, 2008 WL 2894906, at **4−5

---

[3] Beneficiaries contend that Garza waived all of these arguments by not asserting them to the trial court. It is undisputed that Garza failed to make any objection or argument regarding these issues to the trial court. Rather, on appeal, Garza argues that he was not required to raise any of these issues to preserve error. We assume without deciding that error is preserved for our review.

(Tex. App.—Corpus Christi July 29, 2008, no pet.) (mem. op.). Moreover, in *Gober v. Davis*, the Waco Court of Appeals determined that the trial court was not required to enter a finding that an annuity agreement was rescinded to hold that the beneficiary designation on the agreement was void. No. 10-06-00043-CV, 2007 WL 1147353, at *3 (Tex. App.— Waco Apr. 18, 2007, no pet.) (mem. op.). We agree with the Waco Court of Appeals and determine that Beneficiaries did not have to plead rescission to be entitled to a declaratory judgment that the P.O.D. designations were void. *See id.* Because we have determined that the trial court did not grant the equitable remedy of rescission, Garza's argument that Beneficiaries were required to establish that they had no adequate remedy at law also fails.[4] *See Patterson v. Wizowaty*, 505 S.W.2d 425, 428 (Tex. Civ. App.—Houston [14th Dist.] 1974, no writ).

Garza also argues that Beneficiaries were required and failed to show that Minton took active steps to disaffirm the contract. *See Missouri Pac. Ry. Co. v. Brazil*, 10 S.W. 403, 406 (1888) (determining that a voidable contract can be ratified if it is not disaffirmed). Garza, however, directs us to no law requiring a party to show disaffirmance to be entitled to the rescission of, or a declaratory judgment that, a P.O.D. contract entered into by a party, now deceased, is void. *See* TEX. R. APP. P. 38.1(i). Moreover, Garza cites no law indicating that, as Minton's heirs, Beneficiaries could not disaffirm the P.O.D. contract by filing a lawsuit to declare them void. *See Breaux v. Allied Bank of Texas*, 699 S.W.2d 599, 604 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.)

---

[4] Moreover, we are not persuaded by Garza's argument that Beneficiaries had an adequate remedy at law because they could have filed a suit for conversion. *See Patterson v. Wizowaty*, 505 S.W.2d 425, 428 (Tex. Civ. App.—Houston [14th Dist.] 1974, no writ) (reasoning that "a basic corollary to the equitable right of rescission is the principle that rescission is not ordinarily available if an action for damages at law provides an adequate remedy"). Specifically, Garza does not explain how Beneficiaries, without having the P.O.D. designations declared void, could have alleged that a defendant wrongfully exercised dominion or control over the estate's property. *See Green Int'l v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997).

21

(holding that temporary guardians disaffirmed a contract with an attorney when they filed an "Opposition to Application For Attorney's Fees" with the court). Accordingly, we conclude that Beneficiaries were not required to provide evidence or request a jury question regarding whether Minton disaffirmed the contracts.

For the foregoing reasons, we overrule Garza's remaining issues.

## VI. CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
30th day of January, 2014.