**Diane Davis ECKELS and John Byron Davis, Appellants,**

**v.**

**Marceil Brewster DAVIS and Paul Hesse Welch, Individually and as Independent Co–Executors Under Last Will and Testament of J.B. Davis, and Paul Hesse Welch, Individually and as Co–Trustee of the J.B. Davis Living Trust, Appellees.**

No. 2–02–037–CV.

Court of Appeals of Texas, Fort Worth.

June 19, 2003.

Judith P. Kenney & Associates, P.C., and Judith P. Kenney, Addison, for appellants.

Jackson Walker L.L.P., John A. Keopke, A. David Gross, Michael Byrd, Dallas, Wilson & White, L.L.P., William L. White, Fort Worth, for appellees.

Panel B: HOLMAN, GARDNER, and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

This is a summary judgment appeal from a declaratory judgment action construing the terms of a living trust. The trust identified two numbered accounts at a financial management company as the trust corpus. The primary issue we address in this appeal is whether the financial management company's unilateral act of renumbering one of the accounts for internal bookkeeping reasons transformed the assets in the renumbered account into non-trust assets. We hold that the renumbering of the account created a latent ambiguity, which was properly resolved by the admission of extrinsic evidence, and did not indicate any change in J.B. Davis's intent to distribute the account's assets through the terms of the trust. Therefore, we will affirm the trial court's judgment.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On February 25, 1993, J.B. Davis ("Settlor") executed the "J.B. Davis Living Trust" (hereinafter "Trust"). Exhibit A attached to the Trust document indicates that the following assets were to be delivered to the Trust to fund it:

Delivered to the [Living] Trust at execution of the Trust document are all the assets in two accounts held in custody by Charles Schwab of Dallas, Texas and Morgan Keegan & Co. of Pensacola, Florida, each subject to a Discretionary Investment Advisory Agreement with Fiduciary Financial Services of the Southwest, Inc. of Dallas, Texas and designated by that latter firm as Account Number 1716 and Account Number 1717.

On December 30, 1992, in preparing to create the Trust, Settlor changed the custodian of his Charles Schwab account to Morgan Keegan. Following the Trust's creation on February 25, 1993, the assets in the Charles Schwab account were transferred to the new Morgan Keegan account number 45203031, and the Charles Schwab account was closed.

The Trust was funded on or about April 16, 1993. At that time, the two accounts referenced in Exhibit A to the Trust document consisted of (1) a rollover IRA with Morgan Keegan & Co. containing approximately $690,000, which Morgan Keegan identified as account number 75902072 and which Fiduciary Financial Services of the Southwest (hereinafter "FFSS") designated as account number 1716; and (2) an individual account at Morgan Keegan containing approximately $345,000, which Morgan Keegan identified as account number 45203031 and FFSS designated as account number 1717. FFSS provided discretionary investment advisory services for these two accounts, while Morgan Keegan held custody of the assets in each of the accounts.

Originally, the terms of the Trust, specifically paragraph 2.04, provided that the Trust would terminate upon the death of both Settlor and his wife, Marceil Brewster Davis ("Marcy"), with the remaining assets to then be distributed equally between Settlor's children from a previous marriage, Diane Davis Eckels ("Eckels") and John Byron Davis ("Davis"). On April 1, 1993, before the trust was funded, however, Settlor amended paragraph 2.04 of the Trust (hereinafter "Trust Amendment") to provide as follows:

If not earlier terminated by distribution of all of the assets of this Trust under other provisions hereunder, this Trust shall terminate ninety (90) days following the death of the Settlor at which time the corpus and undistributed income remaining shall be distributed as follows:

From my IRA Rollover account, # 1716, I hereby direct that $300,000 shall be distributed to separate IRA accounts for each of my two children, **JOHN BYRON DAVIS** of Baker, Louisiana and **DIANE DAVIS ECKELS** of Houston, Texas. This totals $600,000. Should there be less than $600,000 in the IRA account at the date of my death, I direct the trustee to make up the difference out of my Individual Account, # 1717. If there is an excess of $600,000 in my IRA Rollover account, I direct that the remainder be given to my wife, **MARCEIL BREWSTER DAVIS.** Further, she will receive all of the assets in my Individual Account # 1717, that [are] not used to make up any deficiency in my IRA Rollover Account.

Sometime after the Trust Amendment was executed, Morgan Keegan assigned Settlor's Individual Account a new account number, changing it from 45203031 to 19015304, to reflect its designation as a trust account. When Morgan Keegan renumbered its account, FFSS also opened a new account, number 2095, to correspond to the new account number assigned by Morgan Keegan. Once all of the assets were transferred and reflected in the new accounts, FFSS closed account 1717. Settlor did not amend the Trust to reflect the account number change by FFSS.

Settlor died on August 2, 1998. When the Trust terminated ninety days later, Settlor's IRA Rollover Account, which was held in the custody of Morgan Keegan in account 75902072 and designated by FFSS as account 1716, had a balance in excess of $900,000, and his Individual Account, also in the custody of Morgan Keegan in account 19015304 and designated by FFSS

as account 2095, had a balance of $363,662.53. Settlor's attorney, Paul Hesse Welch ("Welch"), and Settlor's brother, Stuart Switzer Davis,[1] acting as successor co-trustees for the Trust, distributed $600,000 from the IRA Rollover account, or FFSS account 1716, to Settlor's children, Eckels and Davis, and distributed the balance of the assets in this account and all of the assets in the Individual Account, or FFSS account 2095, to Settlor's wife, Marcy.

Appellants Eckels and Davis filed a declaratory judgment action, asserting that FFSS account 2095, containing assets worth $363,662.53, was erroneously distributed entirely to Marcy under the terms of the Trust when one-third of the $363,662.53 should have passed to each of them under the terms of their father's will.[2] Eckels and Davis filed a motion for summary judgment claiming that the Trust only authorized distribution of the assets in FFSS account 1717 to Marcy and that because FFSS account 1717 ceased to exist when it was closed in 1994, the Trust language giving Marcy all the assets in FFSS account 1717 was not applicable to account 2095. Therefore, they claimed that FFSS account 2095 passed outside the Trust.

Appellees Marcy and Welch also sought summary judgment, asserting that the account numbers were used in the Trust only to distinguish between Settlor's IRA Rollover Account assets and his Individual Account assets. Marcy and Welch argued that an ambiguity existed in the Trust language in that it could be construed as disposing of Settlor's Individual Account, no matter what its FFSS number, or it could be read as disposing of only FFSS

---

1. The claims against Stuart Switzer Davis were non-suited in the trial court, and he is not a party to this appeal.

2. Settlor's will provided for the equal distribution of his assets, one-third to Eckels, one-third to Davis, and one-third to Marcy.

account number 1717. In light of this alleged ambiguity, Marcy and Welch claim that the trial court should, and properly did, look at extrinsic evidence showing Settlor's intent to distribute his Individual Account to Marcy, so long as his children had already received $300,000 each.

The trial court denied Eckels and Davis's motion for summary judgment, overruled Eckels and Davis's objections to the extrinsic summary judgment evidence relied upon by Marcy and Welch in support of their motions for summary judgment, and granted summary judgment for Marcy and Welch. Eckels and Davis raise five issues on appeal challenging the trial court's summary judgment for Marcy and Welch and its denial of their motion for summary judgment.

### III. STANDARD OF REVIEW

In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *S.W. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). Summary judgment is proper when parties do not dispute the relevant facts. *Havlen v. McDougall,* 22 S.W.3d 343, 345 (Tex.2000).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Dow Chem. Co. v. Bright,* 89 S.W.3d 602, 605 (Tex. 2002). The reviewing court should render the judgment that the trial court should have rendered. *Id.* When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995); *Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex. 1995).

### IV. AMBIGUITY OF LIVING TRUST

In their first, second, and fourth issues, Eckels and Davis complain that the trial court erred by impliedly determining that the Trust Amendment was ambiguous, by considering extrinsic evidence of Settlor's intent, and by overruling their objections to Marcy and Welch's summary judgment evidence. We address these issues in turn.

### A. RULES OF CONSTRUCTION FOR DETERMINING AMBIGUITY

Eckels and Davis do not dispute that the assets from Settlor's Individual Account 1717 were, in fact, transferred to account 2095 following the Trust's creation. Rather, their contention is that the rules of construction, when correctly applied, show the clear intent of Settlor that account 2095 pass under Settlor's will in equal thirds to Marcy, Eckels, and Davis. Eckels and Davis also maintain that *San Antonio Area Foundation v. Lang* is controlling and that under *Lang* the trial court erred in finding a latent ambiguity in the trust documents and in considering extrinsic evidence. 35 S.W.3d 636, 640 (Tex. 2000) (holding that the term "real property" is clear and unambiguous based on definitions from the Probate Code and the Property Code).

Marcy and Welch, on the other hand, maintain that FFSS account 2095 should be construed as the same account as FFSS account 1717 for purposes of distribution under the Trust, as amended, because the account numbers are not controlling, the

assets are substantially the same, and the Settlor's intent was for Marcy to receive the balance of his investment accounts.

The rules of construction of wills and trusts are well settled. *Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The construction of a will or a trust instrument is a question of law for the trial court. *Id.* (citing *Nowlin v. Frost Nat'l Bank*, 908 S.W.2d 283, 286 (Tex.App.-Houston [1st Dist.] 1995, no writ)). A court must construe both wills and trusts to ascertain the intent of the maker. *Id.* (citing *Jewett v. Capital Nat'l Bank*, 618 S.W.2d 109, 112 (Tex.Civ.App.-Waco 1981, writ ref'd n.r.e.)). The intent of the settlor must be ascertained from the language used within the four corners of the instrument. *See Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 151 (Tex.1980) (applying this concept to construe a will). All terms must be harmonized to properly give effect to all parts. *Hutton v. Methodist Home*, 615 S.W.2d 289, 292 (Tex.Civ.App.-Fort Worth 1981, writ ref'd n.r.e.). If possible, the court should construe the instrument to give effect to all provisions so that no provision is rendered meaningless. *Myrick v. Moody*, 802 S.W.2d 735, 738 (Tex. App.-Houston [14th Dist.] 1990, writ denied). If the language of a trust is unambiguous and expresses the intent of the settlor, it is unnecessary to construe the instrument because it speaks for itself. *Hurley*, 98 S.W.3d at 310 (citing *Jewett*, 618 S.W.2d at 112). If, on the other hand, the meaning of the instrument is uncertain or "reasonably susceptible to more than one meaning," the instrument is ambiguous. *Myrick*, 802 S.W.2d at 738.

Because the precise language at issue is contained in the Trust Amendment, we again set forth that amendment:

From my IRA Rollover account, # 1716, I hereby direct that $300,000 shall be distributed to separate IRA accounts for each of my two children, **JOHN BYRON DAVIS** of Baker, Louisiana and **DIANE DAVIS ECKELS** of Houston, Texas. This totals $600,000. Should there be less than $600,000 in the IRA account at the date of my death, I direct the trustee to make up the difference out of my Individual Account, # 1717. If there is an excess of $600,000 in my IRA Rollover account, I direct that the remainder be given to my wife, **MARCEIL BREWSTER DAVIS.** Further, she will receive all of the assets in my Individual Account # 1717, that [are] not used to make up any deficiency in my IRA Rollover Account.

When applying the rules of construction to the four corners of the Trust document as a whole, it is clear that Settlor had two accounts—his IRA Rollover Account and his Individual Account—that were to comprise the corpus of the Trust and that were to be disposed of through the Trust. In attempting to harmonize the terms of the Trust to give effect to all parts, we note that Settlor did not identify the two accounts by reference to the custodian of the accounts in the Trust Amendment as he did in the original Trust document. Instead, he referred to the two accounts as his IRA Rollover Account and his Individual Account, while still linking each of these accounts to his FFSS accounts 1716 and 1717.

Construing the terms of the Trust to ascertain Settlor's intent, it appears that Settlor's primary objective was to ensure that each of his children received $300,000 from the Trust and that Marcy received the balance of the Trust. Settlor directed that $300,000 be paid from his IRA Rollover Account to each of his children. At the time he executed the Trust Amend-

ment, however, he had no way of knowing whether his IRA Rollover Account would be able to fund the entire $600,000. Settlor provided for this contingency in the Trust Amendment by directing that the $600,000 would be paid first from his IRA Rollover Account, with any deficiency being paid out of his Individual Account. Settlor also provided in the Trust Amendment for the contingency that the IRA Rollover Account might have in excess of $600,000 at the time of his death by providing that his wife, Marcy, would receive any excess that remained in his IRA Rollover Account after payment to Eckels and Davis. He then disposed of all remaining assets in his Individual Account by providing in the Trust Amendment that Marcy "will receive all of the assets in my Individual Account # 1717, that [are] not used to make up any deficiency in my IRA Rollover Account."

Additionally, Settlor attempted to ensure that these assets would not be transferred or removed from the Trust by FFSS, Morgan Keegan, or anyone else because he retained for himself, as trustee, the power to remove assets from the Trust. In spite of this provision in the Trust, FFSS unilaterally transferred the assets from account 1717 into a new account after the date of the Trust Amendment. Consequently, the account number reflected in the trust documents for the Individual Account did not exist at the time the co-trustees were to administer the Trust, but the assets of the Individual Account, which were still titled in the name of the Trust, did exist. Because "my Individual Account, # 1717" is susceptible to more than one meaning, i.e., either the assets in Settlor's Individual Account or in Account # 1717, we hold that an ambiguity exists in the Trust language.

■■■■ If the court determines that the document is ambiguous, the resulting ambiguity can be classified as either patent or latent. A patent ambiguity is one apparent on the trust's face. *In re Estate of Brown,* 922 S.W.2d 605, 608 (Tex.App.-Texarkana 1996, no writ) (dealing with patent ambiguity in a will). A patent ambiguity arises on the reading of the trust from the words themselves. *Id.* A latent ambiguity exists when the trust appears to convey a sensible meaning on its face, but it cannot be carried out without further clarification. *Id.* at 608–09; *see also Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) (stating that an example of latent ambiguity would be if a contract called for goods to be delivered to "the green house on Pecan Street," but there were in fact two green houses on Pecan Street).

■■■ We conclude that the Trust Amendment contained a latent ambiguity. Although it appears on its face to convey a sensible meaning, it cannot be carried out without clarification because the change in account numbers raises the question of whether Settlor's intent pertained to the specific account number (*e.g.,* account 1717) or to the type of assets held by the account (*e.g.,* Individual Account), regardless of the number given to the Individual Account.

Eckels and Davis assert that no ambiguity exists because, under *Lang,* we must apply the probate code's definition of "account" and application of that definition renders the Trust language unambiguous. *Lang,* 35 S.W.3d at 640. According to Eckels and Davis, "account" cannot be construed to include # 2095. The probate code defines "account" as "a contract of deposit of funds between a depositor and a financial institution." TEX. PROB.CODE ANN. § 436(1) (Vernon 1980). Application of that definition to the present Trust language does not resolve, but only further highlights, the latent ambiguity. Settlor

had only one "contract of deposit of funds" regarding the assets held in his Individual Account. The contract *for the deposit of funds* included those funds, regardless of any unilateral, internal new number given to the funds. Thus, we hold that *Lang* does not control the present facts.

Citing *Mitchell v. Mitchell*, Eckels and Davis also contend that the Trust language should not be construed as ambiguous because the Trust was drafted by a lawyer. 151 Tex. 1, 244 S.W.2d 803, 806 (1951). We decline to follow their reasoning because they misinterpret *Mitchell*. *Mitchell* holds that when the meaning of language used in a will is settled by usage and the sense that the law has given to it, the language should be so construed, unless the context of the will shows a clear intention to the contrary. Here, Eckels and Davis point to no language that is settled by usage. We overrule Eckels and Davis's first issue.

## B. Extrinsic Evidence Conclusively Establishes Settlor's Intent

 In their fourth issue, Eckels and Davis argue in the alternative that even if there was an ambiguity in the trust documents, then a fact issue exists on Settlor's intent with respect to account 2095. Where there is latent or patent ambiguity, it is proper for courts to admit extrinsic evidence to show the settlor's intent. *In re Estate of Cohorn*, 622 S.W.2d 486, 487–88 (Tex.App.-Eastland 1981, writ ref'd n.r.e.) (admitting extrinsic evidence where there was latent ambiguity in a will construction case to show the intent of the parties to devise a tract of land). Moreover, the court may always receive and

consider evidence concerning the circumstances existing when the trust was written that will enable the court to place itself in the settlor's position at the time and thus to determine the sense in which the words were used by the settlor. *See In re Estate of O'Hara*, 549 S.W.2d 233, 238 (Tex.Civ.App.-Dallas 1977, no writ) (citing *Stewart v. Selder*, 473 S.W.2d 3, 7 (Tex. 1971)) (applying this concept in the context of construing a will to determine whether a bequest was to a foundation or to a museum with a similar name).

 Words may be considered ambiguous only if the meaning remains unclear after extrinsic evidence is received and considered. *Id.* The supreme court has declared that construction of a written instrument is ordinarily a question of law for the court, and even if it contains language on its face ambiguous, but extrinsic evidence of circumstances is undisputed, construction of the instrument is still a question of law for the court. *Id.*

When extrinsic evidence and the evidence of the circumstances existing when the Trust was written are considered in this case, including letters written by Settlor in 1992 and 1993, the evidence shows without dispute that as early as 1992 Settlor had determined how he wanted his assets divided, which included giving $300,000 to each of his children and leaving the remainder of his assets to his wife, Marcy. In 1993, Settlor then executed trust documents in line with the intent that he set forth in his letters and confirmed that his trust documents evidenced his intent by writing additional letters to his attorney after the documents were signed.[3]

---

**3.** A February 26, 1993 letter from Settlor to Welch states:

This is to thank you for completing my trust agreement ("The Living Trust").

I do have a question as to how it relates to my present Will, if it, in fact, does. Or, will my Will need to be modified to conform with my objective to 1. leave a total of $600,000 in assets to my two children, di-

Moreover, the evidence presented through Kathy Boobar's affidavit and the deposition testimony of Welch and Boobar further shows that the change in account numbers was an internal, unilateral change in form required by the management company and not a change in Settlor's intent.[4]

■ We are required to subordinate form to substance. *Flower v. Dort,* 260 S.W.2d 685, 688 (Tex.Civ.App.-Fort Worth 1953, writ ref'd n.r.e.). The fact that the form of assets may change over time does not defeat Settlor's intent of disposing of the assets. *Id.* at 688–90 (holding that where testatrix merely changed the estate from money to bonds and other securities the change in form would not defeat the dominant purpose in her will of leaving her husband's relatives one-half of $40,000 or one-half of the remainder of the estate). Similarly, the fact that designated assets may be transferred to a new account or assigned a new account number will not defeat the general intent to dispose of those same assets where the assets themselves have not changed and are titled as part of the Trust. After all, it is the intention of the settlor that controls, and his intention must be ascertained by considering the entire instrument, not just a single clause. *Id.*

■ Even if we agreed with Eckels and Davis that the bequest of assets in FFSS account 1717 was specific to the account number, we nonetheless agree with Welch's and Marcy's contention that no ademption occurred. Only the alienation or disappearance of the subject matter of a specific devise or bequest from the

settlor's estate adeems the devise or bequest. *Stahl,* 610 S.W.2d at 150. Here, the assets that were the subject of FFSS account 1717 had not been disposed of, alienated, nor had they disappeared at the time of Settlor's death; only the account number was changed. Where, as here, the property which is the subject of the trust corpus is present at the settlor's death, there is no ademption. *Bates v. Fuller,* 663 S.W.2d 512, 516 (Tex.App.-Tyler 1983, no writ) (op. on reh'g). The assets, therefore, were not adeemed.

■ From the evidence, it appears that reasonable minds could not differ with the conclusion that when Settlor provided account names and numbers for each asset, he intended for the asset to be distributed in the manner described in the Trust, regardless of the account number. Eckels and Davis's narrow construction, focusing exclusively on the account numbers, contravenes the intent expressed by Settlor. We must avoid a construction which contravenes the intent expressed in the document as a whole. *Lane v. Sherrill,* 614 S.W.2d 619, 623 (Tex.Civ.App.-Austin 1981, no writ). Therefore, we agree with Marcy and Welch that the extrinsic evidence, which was properly considered by the trial court, conclusively proved that Settlor wanted to move the assets of two existing brokerage accounts into a Living Trust, have the accounts styled in the name of the Trust, and have his wife, Marcy, receive all assets except for $600,000 to be split between Settlor's children. In light of the extrinsic evidence that conclusively establishes Settlor's intent, the Trust was rendered ambiguous and summary judgment was proper. Consequently, we overrule Eckels and Davis's fourth issue.

---

vided equally, and thereby not subjected to estate taxes, and 2. leave the balance of my assets to my wife, Marcy.

4. Eckels and Davis argue that because accounts # 1717 and # 2095 co-existed for a

time, this somehow defeats Settlor's intent. The summary judgment evidence, however, conclusively establishes Settlor's intent, regardless of the unilateral action of the management company.

## C. ECKELS AND DAVIS'S OBJECTIONS TO MARCY AND WELCH'S SUMMARY JUDGMENT EVIDENCE

In their second issue, Eckels and Davis argue that even if an ambiguity exists in the Trust language, the particular extrinsic evidence utilized by Marcy and Welch to evidence Settlor's intent was improper. Specifically, Eckels and Davis argue that the testimony of Welch and his legal assistant, Kathy Boobar,[5] regarding Settlor's intent was improper under Texas Rule of Civil Procedure 166a(c) because it was self-serving and not readily controvertible. *See* TEX.R. CIV. P. 166a(c). Boobar, was employed by FFSS, and FFSS is not a party to the lawsuit. Thus, Boobar was not an interested witness. Additionally, the mere fact that testimony is from an interested witness does not necessarily make the evidence an improper basis for summary judgment; rather, summary judgment is proper if the evidence is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. *Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997). Moreover, the phrase "could have been readily controverted" does not mean that the summary judgment evidence could have been easily and conveniently rebutted, but rather indicates that the testimony could have been effectively countered by opposing evidence. *Id.* Here, as suggested by Marcy and Welch, Eckels and Davis could have deposed a representative of the custodian, Morgan Keegan, in an effort to controvert Boobar and Welch's explanations for the change in the account numbers. Thus, the court

properly considered testimony of Welch and Boobar, which was clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.

Eckels and Davis also contend that the affidavit and deposition testimony from Welch and Boobar contravene the Dead Man's Rule. Marcy and Welch argue that any such testimony was corroborated and therefore properly admitted. The Dead Man's Rule mandates that neither party to the lawsuit shall be allowed to testify against the other concerning any oral statement by the testator unless the testimony or the oral statement is corroborated or the witness is called by the opposite party to testify about the oral statement. TEX.R. EVID. 601(b). The corroboration need not be sufficient on its own to support the verdict, but must tend to confirm and strengthen the testimony of the witness and show the probability of its truth. *Powers v. McDaniel,* 785 S.W.2d 915, 920 (Tex.App.-San Antonio 1990, writ denied). Here, Welch's testimony was properly corroborated by Boobar, a disinterested witness, and by Settlor's written statements. *See id.* (stating that corroboration may come from any other competent witness or other legal source, including documentary evidence). Therefore, the testimony provided by Welch and Boobar through depositions and affidavits was not inadmissible hearsay.

Eckels and Davis also argue that "other declarations" by Settlor, such as letters he wrote before and after the creation of the Trust, are generally inadmissible and should not have been considered

---

5. Eckels and Davis also argue that Welch's attorney prevented Kathy Boobar from testifying fully at her deposition about the reason for creating Account # 2095 because a lunch break was requested. Eckels and Davis do not point us to any reference in the record showing where they objected to this recess. Since private conferences may be held during agreed recesses and adjournments, we disagree that the lunch recess tainted Boobar's testimony. *See* TEX.R. CIV. P. 199.5(d).

by the trial court. They base their argument on *Tabassi v. NBC Bank—San Antonio,* 737 S.W.2d 612 (Tex.App.-Austin 1987, writ ref'd n.r.e.) and *First National Bank of Galveston v. Trinity Protestant Episcopal Church of Galveston,* 219 S.W.2d 828 (Tex.Civ.App.-Galveston 1949, no writ). These two cases are inapposite to the present case because neither case involved a finding of latent ambiguity. *But see Stewart,* 473 S.W.2d at 7 (finding that declarations by a testator dealing with his intention may be received as an aid in resolving specific problems of interpretation, such as equivocation or latent ambiguity).

Consequently, we hold that the trial court did not err by overruling Eckels and Davis's objections to Marcy and Welch's summary judgment evidence. We overrule Eckels and Davis's second issue.

### V. CONCLUSION

Having held that the trial court properly granted summary judgment, we need not address the remaining issues raised by Eckels and Davis. *See* TEX.R.APP. P. 47.1. We affirm the trial court's judgment.