

# NUMBER 13-12-00576-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE ESTATE OF JAMES M. LUTHEN, DECEASED

On appeal from the County Court at Law No. 1
of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Longoria**
**Memorandum Opinion by Justice Perkes**

This appeal concerns James M. Luthen's will and trust. The trial court granted traditional summary judgment in favor of appellee Donald Ley,[1] the named executor in Luthen's will, and against appellants Patrick James Luthen, individually and as next

---

[1] Donald Ley is married to Luthen's daughter Sandra Ley.

friend of Andrew Luthen, and Rachel Luthen (collectively "contestants").[2] Contestants asserted, and re-argue here, that their father Rick Luthen unduly influenced Luthen to make the second codicil to his will.

The trial court granted a separate traditional summary judgment in favor of Ley on the declaratory-judgment claim brought by appellant Terolle Ann Luthen ("Terolle Ann").[3] Terolle Ann argues that the corporate stock mentioned in Luthen's trust should pass to her and her sister Nancy Jo Wrather ("Nancy Jo")[4] in accordance with the trust provisions rather than be available for Ley to purchase as purportedly allowed by Luthen's second codicil to his will. In the alternative, Terolle Ann argues Ley should pay fair market value for the stock because the second codicil did not sufficiently incorporate by reference an agreement setting the price. By a separate issue, Terolle Ann contends the trial court's order admitting Luthen's will with its codicils to probate erred "to the extent it allows" Ley to administrate Luthen's dependent-administration estate without court supervision.

Because the evidence presents a genuine issue of material fact on the existence of undue influence, we reverse the trial court's summary judgment in favor of Ley on contestants' undue-influence challenge, remand that issue for further proceedings, and reverse the trial court's order admitting the second codicil to probate. On Terolle Ann's

---

[2] Patrick James Luthen, Rachel Luthen, and Andrew Luthen are siblings and are Luthen's great-grandchildren. Andrew is a minor. Given that the family members' shared surname, we refer to Luthen family members other than James M. Luthen by their given names.

[3] Terolle Ann Luthen is Luthen's daughter. Terolle Ann has the same first name as her mother, so we use her first and middle names for clarity.

[4] Nancy Jo Wrather is Luthen's other daughter, and she is Rick's mother. For consistency with our treatment other Luthen family members, we do not refer to her by her surname. We use her first and middle names because that is how the parties refer to her in their briefs.

2

appeal, we hold the trust provision distributing the stock is ambiguous regarding the circumstances in which the stock passes to Terolle Ann, and we reverse the trial court's summary judgment in favor of Ley on that issue and remand it because ambiguity precludes summary judgment.

## I. BACKGROUND

After Luthen's wife Terolle K. Luthen died,[5] his daughter Nancy Jo oversaw his health care. Luthen was in his early nineties and living in Harlingen, Texas, near Nancy Jo and Patrick. While in Texas, several caretakers monitored Luthen's health.

About ten months after Luthen's wife's death, Rick drove from Minnesota, where he resided, to Harlingen, picked up Luthen, and returned with Luthen to Minnesota, where Luthen had resided before living in Texas. According to Terolle Ann's brief, it was in Minnesota that Luthen founded a successful company called L&M Supply, Incorporated, the stock of which is relevant to this appeal. The reason Rick took Luthen to Minnesota is disputed: Rick testified that he and Nancy Jo agreed he would take over overseeing Luthen's care, and Sandra Ley (Sandra) explained that Nancy Jo had decided to move to Seattle; Patrick, however, testified that Nancy Jo complained that Rick took Luthen against her wishes.[6]

In Minnesota, Rick and his girlfriend Janella Krumrei oversaw Luthen's care. Rick and Krumrei testified that Krumrei ensured Luthen took his prescribed medications. Contestants challenge that assertion, relying on Rachel and Patrick's testimony that

---

[5] The details regarding Luthen's wife's estate can be found in a separate case before this Court. See In re Estate of Terolle K. Luthen, No. 13-12-00638-CV, 2014 WL 4795038, at *1–10 (Tex. App.—Corpus Christi Sept. 25, 2014, no pet. h.) (mem. op.).

[6] The record does not include deposition testimony of Nancy Jo.

3

Rick withheld medications. It is undisputed that Luthen financially assisted Rick and Krumrei while in their care. As evidence of Rick's control over Luthen, contestants presented a letter written by Jim Olson, Luthen's friend and financial advisor, to Nancy Jo, in which Olson stated:

> I am sure Rick is in control of [Luthen's] actions and I don't know if your Dad makes any decisions on his own anymore, I was so much more comfortable when you were down in Texas looking after [Luthen], I had no worries and knew [Luthen] was getting great care, now I am not so sure
>
> . . . right now [Rick] has your Dad's checkbook and is making the decisions for [Luthen].

While in Minnesota, Luthen executed the second codicil to his will. Kent Nyberg drafted the codicil. He testified that he represented Luthen for more than twenty-one years. He had also once represented Rick in a real estate transaction, and contestants assert Nyberg represented Rick more than Luthen in the execution of the second codicil. It is undisputed that Rick was present when Luthen executed the codicil. The witnesses to the codicil execution were Nyberg's wife Wendy and Wade Freshour, a minister who had an office in the same building as Nyberg's office, where the codicil execution occurred. Contestants question the selection of Freshour as a witness, characterizing him as a "straw witness" because, according to an employee of Nyberg, Freshour was infrequently selected as such a witness.

Luthen's second codicil substituted Rick, who received only a share of Luthen's "remaining tangible personal property" under the will and its first codicil, for contestants as a beneficiary of Luthen's residuary estate. Nyberg testified that Luthen told him, "I want the kids out, I want Rick back in." The second codicil also granted to Ley "the option to purchase any stock of L&M Supply, Incorporated, which I own at my death."

4

## II. STANDARD FOR REVIEWING TRADITIONAL SUMMARY JUDGMENT

We review the trial court's summary judgment de novo. *Provident Life &
Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). The standard of review
for a traditional summary-judgment motion is well-established: (1) the movant must
show there is no genuine issue of material fact and that it is entitled to judgment as a
matter of law; (2) we take as true evidence favorable to the non-movant; and (3) we
indulge every reasonable inference in favor of the non-movant and resolve all doubts in
its favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *see* TEX.
R. CIV. P. 166a(c). The nonmovant has no burden to respond to or present evidence
regarding the motion until the movant has carried its burden. *State v. Ninety Thousand
Two Hundred Thirty-Five Dollars and No Cents in U.S. Currency*, 390 S.W.3d 289, 292
(Tex. 2013). If opposing parties move for traditional summary judgment on the same
issues, as Ley and Terolle Ann did on Terolle Ann's declaratory-judgment claim, and the
trial court grants one motion and denies the other, "we review all the summary judgment
evidence, determine all issues presented, and render the judgment the trial court should
have." *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013); *Mann
Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

## III. UNDUE INFLUENCE

By two issues, which we construe as one,[7] contestants argue the evidence
creates a genuine issue of material fact regarding the existence of undue influence by

---

[7] As briefed, one issue challenges the trial court's summary-judgment order, and the other issue, logically premised on the first, challenges the trial court's order admitting Luthen's will with the second codicil to probate.

Rick on Luthen in making the second codicil, thereby precluding it from being admitted to probate. We agree.

## A.    Applicable Law

Undue influence in the procurement of a testamentary document is a ground for its avoidance. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). Not every influence, however, is undue. *Id.*; *In re Estate of Graham*, 69 S.W.3d 598, 609 (Tex. App.—Corpus Christi 2001, no pet.). Influence is undue only when it destroys the testator's free agency and makes the will express the wishes of the one exerting the influence rather than the testator. *Rothermel*, 369 S.W.2d at 922; *In re Estate of Graham*, 69 S.W.3d at 609. One may request, importune, or entreat another to create a favorable dispositive treatment, but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument. *Rothermel*, 369 S.W.2d at 922; *In re Estate of Graham*, 69 S.W.3d at 609.

Proof of undue influence "involves an extended course of dealings and circumstances" and may be proved by direct or circumstantial evidence. *Rothermel*, 369 S.W.2d at 922; *In re Estate of Graham*, 69 S.W.3d at 609. "More often than not, undue influence is impossible to establish by direct proof[] and may only be shown by circumstances." *In re Estate of Olsson*, 344 S.W.2d 171, 173–74 (Tex. Civ. App.—El Paso 1961, writ re'fd n.r.e.); *see In re Estate of Fiedler*, No. 13-09-00386-CV, 2011 1441888, at *3 (Tex. App.—Corpus Christi Apr. 14, 2011, no pet.) (mem. op.). Circumstances proving undue influence "must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *Rothermel*, 369 S.W.2d at 922; *In re Estate of Graham*, 69

6

S.W.3d at 609. Moreover, the circumstantial evidence must do more than merely create a surmise or suspicion that undue influence was exerted at the time of execution. *In re Estate of Graham*, 69 S.W.3d at 610; *Guthrie v. Suiter*, 934 S.W.2d 820, 831 (Tex. App.—Houston [1st Dist.] 1996, no writ); *see Rothermel*, 369 S.W.2d at 922.

To prevail on proving undue influence, the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament or codicil; and (3) the execution of the testament or codicil which the maker would not have executed but for such influence. *Rothermel*, 369 S.W.2d at 922; *In re Estate of Graham*, 69 S.W.3d at 609. The *Rothermel* Court provides ten factors to determine whether the three undue-influence elements have been satisfied. *Rothermel*, 369 S.W.2d at 923. We consider:

(1)     the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence;

(2)     the opportunities existing for the exertion of the type of influence or deception possessed or employed;

(3)     the circumstances surrounding the drafting and execution;

(4)     the existence of a fraudulent motive;

(5)     whether there has been a habitual subjection of the testator to the control of another;

(6)     the state of the testator's mind at the time of execution;

(7)     the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

(8)     words and acts of the testator;

7

(9)    weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise; and

(10)    whether the testament executed is unnatural in its terms of disposition of property.

*Id.*; *In re Estate of Graham*, 69 S.W.3d at 609–10. Factors one through five relate to the first undue-influence element (whether such influence existed and was exerted); factors six through nine relate to the second element (whether the testator's will was subverted or overpowered by such influence); and the tenth factor relates to the third element (whether the testament would have been executed but for the influence). *See Rothermel*, 369 S.W.2d at 923. In reviewing a claim of undue influence, it is proper to consider all evidence of relevant matters that occurred within a reasonable time before or after the will's execution. *Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.—Houston [14th Dist.] 1992, writ denied); *see also In re Estate of Fiedler*, 2011 WL 1441888, at *3.

## B.    Discussion

### 1. The existence and exertion of an influence

#### a.    Nature and type of relationship between Luthen, the contestants, and Rick

Luthen's friend Jack Williams testified that Luthen's relationship with Rick was mostly bad. The depositions reveal that Rick has an extensive history of using illegal drugs, and Williams explained that, based on his conversations with Luthen, Rick's drug habit soured the relationship between Rick and Luthen. Patrick said Luthen blamed Rick's drug use for Rick's "behavior," which Luthen allegedly viewed with "dissatisfaction."

8

Deposition testimony highlighted specific instances of tension in Rick's relationship with Luthen. Williams related an incident when Luthen took property from Rick "[b]ecause of the drugs and [Luthen] didn't think that [Rick] deserved the property." According to Patrick, Rick responded by "get[ting] in [Luthen's] face," pushing him, and "threaten[ing] to beat him up if he ever tried to cross him again."

Williams testified that the relationship between Luthen and Rick worsened until about the last year of Luthen's life, when Rick took over caring for him. In Williams's estimation, their relationship improved at that point. According to Rick, Luthen changed his will and told him, "Here's your second chance, don't give it away." Rick also asserted he no longer uses drugs.

In contrast to Rick's rocky relationship with Luthen, Patrick's testimony depicts a positive relationship between himself and Luthen. Krumrei said Luthen "loved Patrick to pieces." Nyberg, on the other hand, said Luthen called Patrick a "crook" and, in discussing his estate, wanted Patrick "out totally." Sandra remembered Luthen complaining that he gave Patrick a boat with the expectation that Patrick would take him fishing but then never saw the boat again.

There is no record evidence of how Rachel and Luthen interacted and no evidence regarding the relationship between Luthen and Andrew. Luthen named Rachel and Andrew as beneficiaries in his will before it was amended with the second codicil. Regarding the contestants' relationship with Rick, Rachel testified that her relationship with her dad was good. Patrick testified that his relationship with his dad was bad, and he related two incidents in which Rick threatened to physically harm him. There is no record evidence of Rick's relationship with Andrew.

9

Viewing the foregoing, conflicting evidence[8] in the light most favorable to the contestants, it weighs in favor of there being a genuine issue of material fact on the first undue-influence element.[9]

### b. Opportunities to exert undue influence

Moving Luthen to Minnesota to live alone with Rick and Krumrei gave Rick an opportunity to exert undue influence. In Minnesota, Luthen was in the sole care of Rick and Krumrei, and, as detailed below in discussing Luthen's alleged physical and mental infirmities, Luthen depended on them. Moreover, Patrick testified that Rick prevented Patrick and all of the other family members from seeing Luthen, excluding the possibility of countervailing influences. Rachel claimed that Rick isolated Luthen, keeping him "away from a lot of people . . . ." According to Patrick, Rick threatened him physical harm if he attempted to visit Luthen. Patrick also testified that Rick took Luthen's cell phone and screened Luthen's calls, disallowing Patrick to talk to Luthen. Olson's testimony supported this assertion; he testified that Nancy Jo believed Patrick intercepted her phone calls and refused to relay her voicemails to Luthen.

Ley agrees that opportunity existed, but he emphasizes that opportunity alone is insufficient to prove undue influence. Ley is correct that proof of opportunity by itself is

---

[8] We recite only the evidence that is necessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1. Because the evidence already discussed under this factor is sufficient to manifest tension in the relevant relationships, we will not consider less relevant evidence about Rick's relationship with others besides Luthen and contestants. *See Rothermel v. Duncan*, 369 S.W.2d 917, 923 (Tex. 1963) (focusing only on the "relationship existing between the testator, the contestants, and any party accused of exerting such influence."). We incorporate throughout the factors analysis this rule of limiting our use of evidence to evidence that is both relevant and supported by the record.

[9] The ten undue-influence factors are useful, but because they are factors and not elements, proof satisfying each factor is not a necessary condition to finding undue influence. *See generally Rothermel*, 369 S.W.2d at 923; *In re Estate of Graham*, 69 S.W.3d 598, 609–11 (Tex. App.—Corpus Christi 2001, no pet.). The factors need not be independently rather than aggregately weighed, but we do so to because it helps aggregately weigh them in this case.

10

not dispositive of the first element, but it is nevertheless a relevant factor to be weighted. *See Rothermel*, 369 S.W.2d at 923; *In re Estate of Graham*, 69 S.W.3d at 609–10. This factor weighs in favor of holding that a fact issue exists.

### c.    The circumstances surrounding the second codicil

Nyberg drafted the second codicil. Although he worked with Luthen for many years, contestants make much of the fact that he previously represented Rick in a real estate transaction. Nyberg acknowledged representing Rick in the property purchase, but he disavowed any other work for him. In fact, Nyberg testified that he had prosecuted Rick for violating a zoning ordinance. Nevertheless, when asked if Rick was his client during the codicil execution, Nyberg's ultimate response was less clear; he responded, "That would be a good question." Rick testified that Nyberg "just did business stuff for me" and "drafted some contracts I've had in the past for me." When asked if he considered Nyberg to be one of his lawyers, Rick affirmed that he did.[10]

Patrick testified that Nancy Jo informed him in a telephone conversation that Rick wanted to change Luthen's will and thereby remove Patrick. This testimony supports a conclusion that Rick, rather than Luthen, initiated the will change. Other testimony, discussed under the next factor, indicates Rick attempted to use Luthen's will to control and get revenge on some family members. Viewing this evidence in the light most favorable to the contestants, this factor favors finding a fact issue on the first element of undue influence.[11]

---

[10] Rick earlier answered the same question in the negative.

[11] We are less suspicious than the contestants regarding other details of the execution and do not address them. *See* TEX. R. APP. P. 47.1.

11

### d. The existence of a fraudulent motive

Rick was in a position to financially benefit by influencing Luthen to change his will. While Luthen lived, Rick received Luthen's financial assistance. Such assistance would cease after Luthen's death because Luthen's will and its first codicil did not give much to Rick. In addition to the obvious financial incentive for changing the will, there is evidence Rick wanted to use Luthen's will to control or exact revenge on family members.[12] Patrick testified that Rick "had a vendetta" with him and threatened, "I'm going to take your money . . . you've benefited enough from the quote/unquote Luthen's [sic]." Patrick also testified that Nancy Jo informed him that Rick wanted to change the will "and that [Rick] was—you know, that I better be careful."[13]

In response, Ley argues that the alleged fraudulent motive is insufficient to prove undue influence. Again, although proof of this factor alone is insufficient to prove undue influence, it is one of the ten applicable factors. This factor weighs in favor of finding a fact issue.

### e. Habitual Subjection

Ley correctly notes that several deponents thought Luthen was strong-willed and generally not a person easily subjected to another person's influence. When Olson was asked what his response had been to the allegation by someone (the record does not reveal who alleged it) that Rick controlled Luthen "with respect to the second codicil," Olson answered, "My response was not much. Listening and saying, well, I don't know, I don't think so; but, you know, that's her opinion." On the other hand, Olson's email

---

[12] There is substantial testimony chronicling the tension between Rick and other family members.

[13] Rachel also testified that Rick wanted to "even the score" with his ex-wife, but she did not say Rick sought to do that in connection with Luthen's will.

12

warned Nancy Jo, "I am sure Rick is in control of [Luthen's] actions and I don't know if your Dad makes any decisions on his own anymore." Olson's email, which was sent about one month before Luthen's death, is some evidence of habitual subjection, and it is sufficient to create a genuine issue of material fact on this factor.

### f. Balance

On balance, the above factors reveal a genuine issue of material fact on the existence and exertion of influence. *See Rothermel*, 369 S.W.2d at 922–23. It is undisputed Rick had an opportunity and reason to influence Luthen to change his will, which previously provided little for Rick. It is undisputed Rick and Luthen had a rocky relationship. Although there is some evidence their relationship improved at the end, the perceived improvement could be evidence of the influence as much as it could be of an unexpected upswing in the relationship. Regardless, it is undisputed that after Rick took Luthen to Minnesota and away from contestants, Luthen replaced contestants in his will with Rick. Some testimony indicates Rick threatened this type of change to Luthen's will. There is also a fact issue as to the extent Nyberg represented Rick and as to the extent Rick subjected Luthen's mind. Viewed in the light most favorable to contestants, the evidence supports finding a fact issue on the first element of undue influence. *See Nixon*, 690 S.W.2d at 548–49.

### 2. The effect of the exerted influence on the testator's mind

Factors six through nine overlap more than factors one through five, and based on the evidence, we review them together. Luthen was of advanced age and had limited mobility. Testimony showed he had impaired hearing, and Rachel indicated he needed a magnifying glass to read.

13

The evidence of Luthen's mental state at the time of the second codicil is conflicting. As Ley stresses, several deponents, including those present when Luthen executed his second codicil, testified that Luthen was lucid and mentally sound. In contrast, Patrick claimed Luthen was forgetful and "not aware of his surroundings,"[14] and Patrick doubted Luthen's "ability to make informed decisions." Rachel testified that Luthen's short-term memory was not intact and that he lacked the ability to disregard distractions and "to really assess options, understand completely the situation [changing his will]." Rachel worried that Luthen was "very vulnerable for that sort of situation [being subjected to undue influence] . . . he had just lost his wife of 70-odd years. He was lonely." Rachel added that Rick isolated and monitored Luthen "at that emotional period in his life . . . ." In addition to Patrick and Rachel's testimony, contestants presented a medical document of Luthen's "patient information" that stated he suffered a "functional limitation" of "confusion" and that it was "unsafe [for him] to go out of the home alone . . . ."

Ley dismisses contestants' evidence as irrelevant to Luthen's mental state on the day he executed his second codicil, noting that neither Patrick nor Rachel were present when Luthen executed it. In fact, Patrick and Rachel had not seen Luthen in the months immediately preceding the codicil execution. Although less proximate to the codicil execution than the testimony cited by Ley, contestants' evidence of Luthen's mental decline is relevant because it is proper to consider evidence, not only from the day of the codicil's execution, but that occurred within a reasonable time before the codicil execution. *See Watson*, 831 S.W.2d at 837; *see also In re Estate of Fiedler*,

---

[14] Patrick repeatedly testified that Luthen lacked situational awareness.

2011 1441888, at *3. Viewed in the light most favorable to the contestants and given the evidentiary conflict, this element weighs in favor of submitting undue influence to a jury. *See Nixon*, 690 S.W.2d at 548–49.

### 3. But for causation

The last element is "predicated upon" the last factor: "whether the testament executed is unnatural in its terms of disposition of property." *Rothermel*, 369 S.W.2d at 923. Whether the testament unnaturally disposes of property is, to a certain extent, directed by the preceding factors. We consider the testator's stated desires and actions, *see In re Estate of Johnson*, 340 S.W.3d 769, 784 (Tex. App.—San Antonio 2011, pet. denied), and whether the testator unexpectedly disinherited close family members previously provided for, *see In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.). "[I]t is only where all reasonable explanation in affection for the devise is lacking that the trier of facts may" conclude the devise is an "unnatural disposition." *Id.* at 923–24. Seizing upon this definition, Ley argues that the summary judgment was proper because Olson offered two reasonable explanations. First, Olson speculated that Luthen may have changed his will because he and Rick reconciled after Rick began caring for him. Second, Olson speculated that Rick's changed financial situation may have prompted Luthen to make provisions for him.[15]

The presentation of an explanation does not foreclose competing evidence or explanations, and whether an explanation is reasonable hinges on surrounding facts

---

[15] Olson recalled that when he created an irrevocable trust for Luthen, Luthen excluded Rick because he thought Rick was "fine" financially. Olson explained that at the time he created the trust, Rick owned stock, and Olson guessed that Luthen thought Rick was "adequately take care of" with the stock. By the time of the second codicil, however, Rick "no longer ha[d] that stock, and I think [Luthen] felt that Rick need to have something in the will since [Luthen's] original intent . . . was no longer valid."

15

and credibility. *See In re Estate of Johnson*, 340 S.W.3d at 784. In *In re Estate of Johnson*, the appellants challenged the jury's undue-influence finding using the same contention advanced by Ley. *See id.* at 783. The appellants argued that "the evidence could not support a finding of undue influence because evidence was presented establishing a reasonable explanation for B's disposition of his estate." *Id.* Our sister appellate court refused their interpretation of the law "because it ignores the standard of review," which was a sufficiency standard. *Id.* A legal sufficiency review views the evidence in the light most favorable to the jury's verdict, *id.* at 775–76 (applying *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)), which was a finding of undue influence in *In re Estate of Johnson*, *id.* at 783–84. Likewise, our summary-judgment review views the evidence in the light most favorable to the non-movants, *see Nixon*, 690 S.W.2d at 548–49, who in this case argue for a finding of undue influence.

*In re Estate of Johnson* recognized the inescapable principle that the mere offering of an explanation is not dispositive of this factor and element. *See id.* at 784. Olson's explanation does not foreclose contestants' ability to present countervailing evidence and explanations. Contestants characterize Luthen's disposition as unnatural because it substituted Rick, who had a rocky relationship with Luthen and had been practically excluded from Luthen's will, for contestants, whom allegedly had a great, longstanding relationship with Luthen and whom Luthen had included in his original estate plan. We hold that when, as here, competing explanations are advanced by the parties, "the jury must determine which explanation should be given more weight and which explanation is more credible." *Id.* This factor and this element weigh in favor of finding a fact issue. *See Nixon*, 690 S.W.2d at 548–49.

16

## C. Summary

Having concluded contestants presented sufficient evidence to create a genuine issue of material fact on the three elements of undue influence, we sustain their issue and hold that the trial court erred by admitting the second codicil to probate. Because the validity of the second codicil depends on the proceedings after remand, we do not address appellant Terolle Ann's fourth issue, in which she argues that the second codicil did not properly incorporate by reference the "Buy/Sell Agreement" noted in the codicil.[16] *See* TEX. R. APP. P. 47.1. In addition, because we reverse the trial court's order admitting the codicil to probate, we need not address Terolle Ann's fifth issue, wherein she asserts that the trial court's language in the order is error "to the extent it allows Ley to administer the estate without court supervision." *See id.*

## IV. TRUST PROVISION

By her first three issues, which we construe as one, Terolle Ann argues that Luthen's trust gave her the L&M stock and that Luthen never explicitly or implicitly revoked that conveyance. It is undisputed that Luthen transferred the L&M stock to his trust.[17] The trust provision Terolle Ann relies on states:

> 2.3.3 If my wife, TEROLLE K. LUTHEN, shall survive me, then I direct my successor trustee to allocate the assets within this trust between the following trusts created by my Will of October 8, 1996.[18] I specifically direct, however, that any shares of L&M Supply, Incorporated, which are part of this trust, shall ultimately descend to my daughters, TEROLLE ANN LUTHEN and NANCY JO, contrary to the terms of my Will dated October 8, 1996.

---

[16] Appellant Terolle Ann argues this issue as an alternative to her first three issues, which are considered in the next section.

[17] The trust recitals record that Luthen transferred the property to the trust that the trustees would distribute under the trust provisions. Ley does not contest that Luthen transferred the stock to the trust.

[18] No list of trusts followed this paragraph. The trusts are listed and described in Luthen's will.

Ley contends that the trust provision specifically conditions the grant on Luthen's wife surviving him, which she did not. According to Ley, the L&M stock instead passes under the trust provision immediately following the foregoing one:

> 2.3.4 Any interest in the trust assets not effectively distributed by the preceding provisions of this agreement shall be distributed according to my will.

The second codicil to Luthen's will, if valid, gave Ley the option to purchase the L&M stock.

## B. Standard of Review and Applicable Law

Construction of an unambiguous trust is a question of law we review de novo. *Gamboa v. Gamboa*, 383 S.W.3d 263, 273 (Tex. App.—San Antonio 2012, no pet.); *see Soefje v. Jones*, 270 S.W.3d 617, 625 (Tex. App.—San Antonio 2008, no pet.); *Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied); *Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "In construing a trust, we are to ascertain the intent of the grantor from the language in the four corners of the instrument." *Soefje*, 270 S.W.3d at 628. If the words are unambiguous, extrinsic evidence is not admissible to show the maker had some other intent than that expressed in the instrument. *Soefje*, 270 S.W.3d at 628 (applying *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 639 (Tex. 2000)); *see Eckels*, 111 S.W.3d at 694; *Hurley*, 98 S.W.3d at 310. "If, on the other hand, the meaning of the instrument is uncertain or reasonably susceptible to more than one meaning, the instrument is ambiguous." *In re Ellison Grandchildren Trust*, 261 S.W.3d

18

111, 117 (Tex. App.—San Antonio 2008, pet. denied); *Eckels*, 111 S.W.3d at 694 (internal quote omitted).

The determination of whether a trust is ambiguous is a question of law that we review de novo.[19] *Myrick v. Moody*, 802 S.W.2d 735, 738 (Tex. App.—Houston [14th Dist.] 1990, writ denied). There are two types of ambiguity: (1) patent ambiguity, which emerges from the words themselves; and (2) latent ambiguity, which emerges when the words, although conveying a sensible meaning on their face, cannot be carried out without further clarification. *In re Ellison Grandchildren Trust*, 261 S.W.3d at 117; *Eckels*, 111 S.W.3d at 695; *see Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 n.4 (Tex. 1995) (explaining a latent ambiguity would exist if a contract called for goods to be delivered to "the green house on Pecan Street," but there were in fact two green houses on Pecan Street). Where there is patent or latent ambiguity, a court may admit extrinsic evidence to show the settlor's intent. *In re Ellison Grandchildren Trust*, 261 S.W.3d at 117; *Eckels*, 111 S.W.3d at 696. If a trust instrument is ambiguous, its interpretation presents a fact issue precluding summary judgment. *Myrick*, 802 S.W.2d at 738; *see Doggett v. Robinson*, 345 S.W.3d 94, 99 (Tex. App.—Houston [14th Dist.] 2011, no pet.).[20]

**C. Discussion**

---

[19] For this reason, Ley is incorrect in conditioning our review of ambiguity on whether Terolle Ann raised it in the trial court.

[20] The rules of construction for wills and trusts are the same. *In re Ray Ellison Grandchildren Trust*, 261 S.W.3d 111, 117 (Tex. App.—San Antonio 2008, pet. denied); *see Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied); *Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

19

We hold that the section 2.3.3 of Luthen's trust is patently ambiguous. The second sentence uses language of contrast—"I specifically direct, however, that any shares . . . shall ultimately descend"—, but it is unclear whether Luthen was contrasting the provisions of that sentence with those of the first sentence or with the provisions of his will, which Luthen mentions in the same sentence—"contrary to the terms of my Will . . . ." In other words, the second sentence, read in context, could mean: (1) regardless of whether his wife survived him, Luthen distributed the stock to his daughters; or (2) if his wife survived him, Luthen gave the stock to his daughters contrary to his will provisions. It is noteworthy that Luthen's will,[21] as it existed at the time he created the trust agreement, already bequeathed the L&M stock to Terolle Ann and Nancy Jo if Luthen's wife *did not* survive him; if Luthen's wife survived him, the stock passed under the will provisions regarding Luthen's residuary estate.

On appeal, Terolle Ann cites extrinsic evidence, but it corresponds only to Luthen's intent in amending the trust rather than his intent behind this clause. Given the patent ambiguity in the trust agreement, we sustain Terolle Ann's objection to the trial court's order granting summary judgment for Ley, *see Doggett*, 345 S.W.3d at 99; *Myrick*, 802 S.W.2d at 738, and on remand the parties will be afforded the opportunity to present extrinsic evidence to support their respective interpretations of the provision. *See In re Ellison Grandchildren Trust*, 261 S.W.3d at 117; *Eckels*, 111 S.W.3d at 696. In light of our holding, we need not address the parties' disagreement on whether Luthen subsequently revoked this trust provision because the potential revocation is

---

[21] Because the will was before the trial court, we consider it because the trust provision at issue references it.

20

relevant to Terolle Ann's declaratory-judgment claim and appeal only if Terolle Ann's interpretation is correct. *See* TEX. R. APP. P. 47.1.

## V. CONCLUSION

We reverse the trial court's order granting summary judgment in favor of Ley on contestants' claim of undue influence, and we reverse the trial court's order admitting the second codicil to probate. We remand the contestants' opposition to the second codicil to the trial court for further proceedings. We also reverse the trial court's order granting summary judgment in favor of Ley and denying summary judgment to Terolle Ann regarding Luthen's trust provisions, and remand that matter to the trial court for further proceedings.

_____
GREGORY T. PERKES
Justice

Delivered and filed the 24th
day of November, 2014.

21